UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

NATURAL RESOURCES DEFENSE
COUNCIL, INC., and PUBLIC CITIZEN, INC.,          :

                                                  :

            Plaintiffs,
                                                  :   08 Civ. 10507 (PGG)

      v.
                                                  :

U.S. CONSUMER PRODUCT SAFETY
COMMISSION,                                       :

            Defendant.                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
## IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT


GREGORY G. KATSAS                        LEV L. DASSIN
Assistant Attorney General               Acting United States Attorney for the
                                         Southern District of New York

EUGENE M. THIROLF                        BETH E. GOLDMAN
Director                                 Assistant United States Attorney
                                         86 Chambers Street, 3rd Floor
DRAKE CUTINI                             New York, New York 10007
Attorney, Office of Consumer Litigation  Telephone: (212) 637-2732
U.S. Department of Justice

**TABLE OF CONTENTS**

Preliminary Statement ................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ............................... 2

    A. The Consumer Product Safety Act ......................................... 2

        1. Consumer Product Safety Standards .................................. 3

        2. Banned Hazardous Products ......................................... 4

    B. Federal Hazardous Substances Act ....................................... 6

    C. The Consumer Product Safety Improvement Act of 2008 ..................... 6

        1. General Lead Ban ................................................. 8

        2. Mandatory Third Party Testing ...................................... 8

        3. Labeling Requirement for Advertising Toys and Games ................. 9

        4. Mandatory Toy Safety Standards .................................... 9

        5. Standards for Durable Nursery Products .............................. 10

        6. All-Terrain Vehicle Standard ....................................... 10

        7. Prohibition on the Sale of Certain Products Containing Specified Phthalates 11

    D. Implementation of the CPSIA by the CPSC ................................ 12

ARGUMENT ......................................................................... 15

THE CPSC'S OPINION REGARDING THE PHTHALATE
PROVISION IS ENTITLED TO DEFERENCE AND SHOULD BE UPHELD ............ 15

    A. The Phthalate Provision of the CPSIA Cannot Be Read To Apply Unambiguously
        to Existing Inventory ................................................... 16

    B. The Commission's Interpretation is Entitled to Deference .................... 20

CONCLUSION ....................................................................... 25

# TABLE OF AUTHORITIES

CASES                                                                                               Page

American Forest & Paper Ass'n v. FERC, No. 07-1328, 2008 WL 5335580
(D.C. Cir. Dec. 23, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Chauffeur's Training Sch., Inc. v. Spellings, 478 F.3d 117 (2d Cir. 2007) . . . . . . . . . . . . . . . . 16

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Chevron, U.S.A., Inc v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984) . . . . . . . 16, 21, 22

Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 22

Cohen v. JP Morgan Chase & Co., 498 F.3d 111 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 17

Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102 (1980) . . . . . . . . . . . . 20

Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

In re New Times Sec. Servs., Inc., 371 F.3d 68 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . 17, 22, 24

Khan v. United States, 548 F.3d 549 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Landgraf v. USI Film Prods., 511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25

Martinez v. INS, 523 F.3d 365 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Mizrahi v. Gonzales, 492 F.3d 156 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Nat'l Cable & Telecom. Ass'n v. Brand X Internet Serv., 545 U.S. 967 (2005) . . . . . . . . . . . . . 16

Petit v. U.S. Dep't of Education, 578 F. Supp. 2d 145 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . 20

U.S. v. One Hazardous Product Consisting of a Refuse Bin, 487 F. Supp 581 (D.N.J. 1980) . . . 6

Russello v. United States, 464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rust v. Sullivan, 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 22

Schneider v. Feinberg, 345 F.3d 135 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Skidmore v. Swift & Co., 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Smiley v. Citibank</u> (S.D.), N.A., 517 U.S. 735 (1996) ................................ 21

<u>Smith v. Doe</u>, 538 U.S. 84 (2003) ................................................ 17

## STATUTES

122 Stat. 3016 (Aug. 14, 2008) ............................................... 11, 16

15 U.S.C. § 1261 ........................................................... 16

15 U.S.C. § 1261(q)(1) ...................................................... 24

15 U.S.C. § 1261(q)(1)(A) .................................................... 20

15 U.S.C. § 1261 note (b)(1)(B) ............................................ 25, 26

15 U.S.C. § 1278 ...................................................... 20, 24, 25

15 U.S.C. § 1278(c)(3) ....................................................... 10

15 U.S.C. § 1278(c)(4) ....................................................... 10

15 U.S.C. § 2051 ......................................................... 12, 26

15 U.S.C. § 2051(b) ...................................................... 20, 21

15 U.S.C. § 2052(a)(16) ...................................................... 24

15 U.S.C. § 2052(a)(6) ....................................................... 20

15 U.S.C. § 2053 ........................................................... 21

15 U.S.C. § 2056 ........................................................ 10, 21

15 U.S.C. § 2056(a) .................................................... 20, 26, 28

15 U.S.C. § 2057 ........................................................... 21

15 U.S.C. § 2057a & 2057b ............................................... 19, 29

15 U.S.C. § 2058 ......................................................... 4, 10

15 U.S.C. § 2058(g) ......................................................... 28

15 U.S.C. § 2058(g)(1) ................................................ 24

15 U.S.C. § 2063 ..................................................... 20

15 U.S.C. § 2064 ..................................................... 24

15 U.S.C. § 2065 ..................................................... 10

15 U.S.C. § 2068(a) .................................................. 22

15 U.S.C. § 2068(a)(1) .............................................. 11, 12

15 U.S.C. § 2075(a) ................................................ 20, 25

15 U.S.C. § 2082 ..................................................... 26

15 U.S.C. § 6004 ..................................................... 26

15 U.S.C. § 6004(c)(4) ............................................... 25

REGULATIONS

16 C.F.R. Part 1202 ................................................... 8

16 C.F.R. Part 1207 ................................................... 8

16 C.F.R. Part 1209 ................................................... 8

16 C.F.R. Part 1210 ................................................... 8

16 C.F.R. Part 1212 ................................................... 8

16 C.F.R. Part 1301 ................................................... 9

16 C.F.R. Part 1303 ................................................... 9

16 C.F.R. Part 1306 ................................................... 9

16 C.F.R. § 1000.2 ................................................ 17, 18

16 C.F.R. § 1000.7 ................................................ 17, 27

16 C.F.R. § 1500.17 ................................................... 11

16 C.F.R. § 1000.1 ........................................................... 26

## LEGISLATIVE HISTORY

H.R. CONF. REP. 92-1593, H.R. Conf. Rep. No. 1593, 92nd Cong., 2nd Sess. 1972, 1972
U.S.C.C.A.N. 4596, 1972 WL 12545 ............................................. 6

H.R. 15003 (June 20, 1972) ............................................. 6, 24, 25

H.R. Conf. Rep. No. 1593 ..................................................... 6

H.R. Conf. Rep. No. 787 ..................................................... 20

154 Cong. Rec. S7867-78 (daily ed. July 31, 2008) ................................. 20

154 Cong. Rec. S7870 (daily ed. July 31, 2008) ................................... 12

Defendant United States Consumer Product Safety Commission ("CPSC")
respectfully submits this memorandum of law in opposition to plaintiffs' motion for summary
judgment and in support of its cross-motion for summary judgment.

## Preliminary Statement

When Congress passed the Consumer Product Safety Improvement Act of 2008
("CPSIA"), it enacted a host of new provisions to be implemented by the CPSC, the agency
charged with the statute's enforcement. The statute was far-ranging and complex. Each of its
new substantive provisions was crafted differently, as explained below, which left to the CPSC
the task of interpreting and implementing the various bans, standards, and other requirements
imposed by the new law.

In enacting a new provision governing certain phthalate-containing products,
Congress neglected to specify whether it applied only to products manufactured after the
effective date or also to existing inventory. Accordingly, the CPSC filled this gap in the statute.
As the CPSC recognized, the CPSIA did not designate the provision as a ban, as it did with
respect to the new lead restrictions. Rather, Congress designated the phthalate provision a
consumer product safety standard under the Consumer Product Safety Act ("CPSA"). The
distinction is significant because, under the CPSA, a consumer product safety standard is
applicable only to products manufactured after its effective date. Thus, the CPSC interpreted the
phthalate provision – a standard – to be applicable only to products manufactured after the
effective date. Plaintiffs nonetheless insist that the clear intent of Congress was for the phthalate
provision to apply to products manufactured before the effective date.

Plaintiffs are plainly wrong that the phthalate provision is unambiguous such that
it must be read as a ban applicable to inventory. On the contrary, the better reading of the

provision, which takes into account the language chosen by Congress and the structure of the statute, is that the provision means what it says – that it is a standard and therefore inapplicable to inventory. But, at a minimum, the statute is ambiguous. When a statute is ambiguous and supports competing interpretations, it is open to interpretation by the expert agency charged with its implementation. That interpretation is entitled to deference from the Court.

The Court should apply that deference here to the CPSC's interpretation of the phthalate provision. The CPSC carefully analyzed the language of the provision, compared it to other provisions of the statute, considered the agency's past interpretations, applied traditional tenets of statutory construction, and determined that the best reading of the provision was to give effect to Congress's choice of language and to treat the phthalates provision as Congress directed – as a consumer product safety standard. The Court should reject plaintiffs' challenge to that decision and defer to the CPSC's interpretation.

## STATUTORY AND REGULATORY BACKGROUND

### A. The Consumer Product Safety Act

In 1972, Congress enacted the Consumer Product Safety Act (the "CPSA"), 15 U.S.C. § 2051 et seq., "to protect the public against unreasonable risks of injury associated with consumer products," "to assist consumers in evaluating the comparative safety of consumer products," "to develop uniform safety standards for consumer products," "to minimize conflicting State and local regulations," and to promote research and investigation into the causes and prevention of product-related harm. 15 U.S.C. § 2051(b).

The CPSA created the Consumer Product Safety Commission ("CPSC"or the "Commission"), an independent regulatory agency, to carry out the statutory purposes. 15 U.S.C.

2

§ 2053. Among the powers granted the CPSC are the authority to prescribe testing programs for consumer products subject to standards and require certification and labeling of products (15 U.S.C. § 2063); to order public notice and recall of products that present "substantial product hazards"(15 U.S.C. § 2064); to inspect and require recordkeeping by manufacturers, private labelers or distributors of consumer products (15 U.S.C. § 2065); and to promulgate consumer product safety rules (15 U.S.C. § 2058).

Under the CPSA, the CPSC is granted authority to promulgate two distinct types of rules – consumer product safety standards pursuant to 15 U.S.C. § 2056 and bans on hazardous products pursuant to 15 U.S.C. § 2057. Consumer product safety standards and rules declaring products as banned hazardous products are defined collectively as consumer product safety rules. 15 U.S.C. § 2052(a)(6).

## 1. Consumer Product Safety Standards

The Commission may promulgate a consumer product safety standard upon a finding that such standard is "reasonably necessary to prevent or reduce an unreasonable risk of injury associated with such product." 15 U.S.C. § 2056(a). Under this provision, the CPSC has issued consumer product safety standards governing a variety of products, including matchbooks (16 C.F.R. Part 1202); swimming pool slides (16 C.F.R. Part 1207); cellulose insulation (16 C.F.R. Part 1209); cigarette lighters (16 C.F.R. Part 1210); and multi-purpose lighters (16 C.F.R. Part 1212). In addition, on occasion, Congress has enacted consumer product safety standards to be administered by the CPSC or directed the Commission to develop standards on specific products. See 15 U.S.C. § 2082 (enacting interim consumer product safety standard for cellulose insulation); 15 U.S.C. § 6004 (bicycle helmets); 15 U.S.C. § 2056 Note (automatic garage door

3

openers).

The CPSA further provides that the effective date of any consumer product safety standard must be at least 30 days after the date of promulgation unless good cause is shown that an earlier effective date is in the public interest. 15 U.S.C. § 2058(g). In no case, however, may the effective date be set at a date earlier than the date of promulgation. Id. Significantly, the CPSA expressly provides that a "consumer product safety standard shall be applicable only to consumer products manufactured after the effective date" of the standard. Id.

The CPSA makes it unlawful for any person to "sell, offer for sale, manufacture for sale, distribute in commerce, or import into the United States any consumer product . . . that is not in conformity with an applicable consumer product safety rule" under the CPSA. 15 U.S.C. § 2068(a).

Finally, whenever a consumer product safety standard is in effect, the CPSA expressly preempts non-identical state or local standards. 15 U.S.C. § 2075(a). ("Whenever a consumer product safety standard under this Act is in effect and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements . . . unless such requirements are identical to the requirements of the Federal standard.").

2. Banned Hazardous Products

In addition to the power to issue consumer product safety standards, if the CPSC finds that a consumer product "is being, or will be, distributed in commerce" and "presents an unreasonable risk of injury," and "no feasible consumer product safety standard . . . would

4

adequately protect the public from the unreasonable risk of injury associated with such product," the CPSC can promulgate a rule declaring the product a "banned hazardous product." 15 U.S.C. § 2057. Under this provision, the Commission has declared bans on unstable refuse bins (16 C.F.R. Part 1301); lead-containing paint (16 C.F.R. Part 1303); and hazardous lawn darts (16 C.F.R. Part 1306), among others. On occasion, Congress has also enacted legislation deeming products banned hazardous products under the CPSA. See, e.g., 15 U.S.C. § 2057a & 2057b (designating butyl nitrites and volatile alkyl nitrites banned hazardous products under the Consumer Product Safety Act (15 U.S.C. § 2057)).

Unlike consumer product safety standards, however, there is no provision in the CPSA restricting the applicability of a ban to products manufactured after the effective date. Indeed, the legislative history for the original legislation makes this distinction plain:

> Consumer product safety standards may be made applicable only to consumer products which are manufactured after the date a standard is promulgated. Thus the Commission could not establish a retroactive effective date for any consumer product safety rule which embodies a product safety standard. Rules declaring a product to be a banned hazardous consumer product, however, may apply to products of new manufacture or to products already distributed in commerce.

House Committee on Interstate and Foreign Commerce ("House Committee Report") 92-1153 to accompany H.R. 15003 (June 20, 1972) (attached, at 37); see also H.R. CONF. REP. 92-1593, H.R. Conf. Rep. No. 1593, 92nd Cong., 2nd Sess. 1972, 1972 U.S.C.C.A.N. 4596, 1972 WL 12545, at *4637; United States v. One Hazardous Product Consisting of a Refuse Bin, 487 F. Supp 581, 587 (D.N.J. 1980) (reiterating applicability of ban to products already in commerce and holding that rented refuse bins are products "distributed in commerce" subject to ban).

In contrast to consumer product safety standards, the CPSA contains no

5

preemption provision with respect to rules that declare products to be banned hazardous products. 15 U.S.C. § 2075(a).

B. Federal Hazardous Substances Act

In addition to bans under the CPSA, the CPSC also has authority to ban hazardous substances in accordance with the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261(q)(1). The FHSA requires uniform cautionary labeling for packages containing hazardous substances, and gives the Commission authority to ban a substance when it finds that "notwithstanding such cautionary labeling as is or may be required under this chapter for that substance, the degree or nature of the hazard involved in the presence or use of such substance in households is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance . . . out of the channels of interstate commerce." 15 U.S.C. § 1261(q)(1); see also 16 C.F.R. § 1500.17. Any toy or other article intended for use by children and that is a hazardous substance or contains a hazardous substance that can be accessed by a child is automatically banned by operation of law. 15 U.S.C. § 1261(q)(1)(A).

The FHSA preempts state and local law with respect to regulations promulgated to impose or enforce a ban under 15 U.S.C. § 1261(q)(1). 15 U.S.C. § 1261 Note (b)(1)(B). The FHSA does not have a provision comparable to section 9(g) of the Consumer Products Safety Act, 15 U.S.C. § 2058(g), that limits the applicability of a ban to products manufactured after the effective date.

C. The Consumer Product Safety Improvement Act of 2008

On August 14, 2008, the President signed into law the Consumer Product Safety

6

Improvement Act ("CPSIA"). Public Law 110-314, 122 Stat. 3016 (Aug. 14, 2008). The CPSIA represented the "most significant overhaul of U.S. consumer product safety laws since the creation of the Consumer Product Safety Commission some 40 years ago." 154 Cong. Rec. H7577 (daily ed. July 30, 2008) (statement of Rep. Dingell), at 2008 WL 2917275. This compromise bill included a variety of new provisions as well as numerous amendments to the CPSA. The CPSIA enhanced the Commission's enforcement authority (see CPSIA § 211) and granted the Commission authority to "issue regulations, as necessary, to implement this Act and the amendments made by this Act." CPSIA § 3 (15 U.S.C. § 2051 Note).

The CPSIA also contained a number of new substantive consumer product safety standards and bans. Significantly, the statute did not simply direct the CPSC to promulgate rules in accordance with the Commission's rulemaking authority, as is the more common practice. Rather, in a number of instances, Congress included in the bill specific rules to be implemented by the CPSC. Specifically, the CPSIA includes a general ban on lead in children's products (sec. 101(a), codified at 15 U.S.C.§ 1278a(a)); a more stringent ban on lead paint (sec. 101(f), codified at 15 U.S.C.§ 1278a(f)); mandatory third-party testing for certain children's products (sec. 102, codified at 15 U.S.C.§ 2063); a labeling requirement for advertising toys and games (sec. 105, codified at 15 U.S.C.§ 2078(c)); mandatory toy safety standards (sec. 106, codified at 15 U.S.C.§ 2056b); standards and consumer registration of durable nursery products (sec. 104, codified at 15 U.S.C.§ 2056a); standards for all-terrain vehicles (sec. 232, codified at 15 U.S.C.§ 2089); and prohibitions on the manufacture and sale of certain products containing specified phthalates (sec. 108, codified at 15 U.S.C.§ 2057c).

Congress treated each of these provisions differently – some of these new

7

provisions were designated as consumer product safety standards, some as bans, and some were less clear. One provision is treated as a regulation under the FHSA (sec. 101 - lead), while the others are consumer product safety standards under the CPSA. The following discussion of various provisions of the CPSIA highlights their variability as to applicability and enforcement.

### 1. General Lead Ban

Section 101 of the CPSIA limits the amount of lead in children's products (as defined in section 3(a)(16) of the Act, 15 U.S.C. § 2052(a)(16)). Effective 180 days after enactment, any children's product that contains more than 600 ppm of total lead "shall be treated as a banned hazardous substance under the Federal Hazardous Substances Act (15 U.S.C. 1261 et seq.)" CPSIA § 101(a). The CPSIA makes explicit that any ban imposed by CPSIA § 101(a) or any rule promulgated under this section "shall be considered a regulation of the Commission promulgated under or for the enforcement of section 2(q) of the Federal Hazardous Substances Act (15 U.S.C. 1261(q))." CPSIA § 101(g). Furthermore, under section 216 of the CPSIA, it is unlawful for any person to "sell, offer for sale, manufacture for sale, distribute in commerce, or import into the Untied States any consumer product, or other product or substance that is . . . a banned hazardous substance within the meaning of section 2(q)(1) of the Federal Hazardous Substances Act (15 U.S.C. 1261(q)(1))." CPSIA § 216(a)(2)(D) (codified at 15 U.S.C. § 2068(a)(2)(D)).

### 2. Mandatory Third Party Testing

The CPSIA adds a requirement that every manufacturer of a children's product, "before importing for consumption or warehousing or distributing in commerce any children's product that is subject to a children's product safety rule," must submit samples to a third party

8

conformity assessment body to be tested for compliance with the children's product safety rule and certify to such testing. CPSIA § 102(a)(2). This new testing requirement applies "to any children's product manufactured more than 90 days after the Commission has established and published notice of the requirements for accreditation of third party conformity assessment bodies." CPSIA § 102(a)(2).

### 3. Labeling Requirement for Advertising Toys and Games

Congress added to the Federal Hazardous Substances Act's requirements for labeling of toys and games, a new requirement for cautionary statements on advertisements for toys and games. CPSIA § 105 (codified at 15 U.S.C. § 1278(c)).

The new law expressly provides that this new requirement "shall be treated as a consumer product safety standard promulgated under section 9 of the Consumer Product Safety Act (15 U.S.C. 2056)." CPSIA § 105 (15 U.S.C. § 1278(c)(4)). It also expressly authorizes the Commission, in promulgating regulations with respect to catalogues, to provide a grace period of no more than 180 days for catalogues printed prior to the effective date of the new rule. CPSIA § 105 (15 U.S.C. § 1278(c)(3)).

### 4. Mandatory Toy Safety Standards

Section 106 of the CPSIA (codified at 15 U.S.C. § 2056b) provides that beginning 180 days after enactment of the Act, "the provisions of the ASTM International Standard F963-07 Consumer Safety Specifications for Toy Safety (ASTM F963), as it exists on the date of enactment of this Act . . . shall be considered to be consumer product safety standards issued by the Commission under section 9 of the Consumer Product Safety Act (15 U.S.C. 2058)." CPSIA § 106(a). In addition, any rules issued by the Commission under this provision will be

9

considered consumer product safety standards under section 9 of the Act (15 U.S.C. § 2058). CPSIA § 106(f). The Act also expressly provides a process for rulemaking by the Commission to consider exemptions from preemption (CPSIA § 106(h)), thereby making plain that Congress contemplated that the usual preemption provisions applicable to these newly mandatory consumer product safety standards were applicable to mandatory toy safety standards.

### 5. Standards for Durable Nursery Products

With respect to standards for durable nursery products (i.e., cribs, toddler beds, gates, bath seats, strollers, etc.) Congress directs the Commission to promulgate consumer product safety standards. CPSIA §§ 104(b), (f) (codified at 15 U.S.C. § 2056a(b) & (f)). With respect specifically to cribs, the CPSIA provides that "[i]t shall be a violation of section 19(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2068(a)(1)) for any person to which this subsection applies to manufacture, sell, contract to sell or resell, lease, sublet, offer, provide for use, or otherwise place in the stream of commerce a crib that is not in compliance with a standard promulgated under subsection (b)." CPSIA § 104(c).

### 6. All-Terrain Vehicle Standard

With respect to All-Terrain Vehicles ("ATVs"), Congress directed the Commission to publish in the Federal Register "as a mandatory consumer product safety standard" the standard developed by the Specialty Vehicle Institute of America for ATVs. CPSIA § 232(a)(1) (codified at 15 U.S.C. § 2089(a)(1)). Congress further provided that after the standard takes effect, 150 days after publication of the standard, "it shall be unlawful for any manufacturer or distributor to import into or distribute in commerce in the United States any new assembled or unassembled all-terrain vehicle unless –(A) the all-terrain vehicle complies with

10

each applicable provision of the standard." CPSIA § 232(a)(2). Failure to comply with such requirements "shall be deemed a failure to comply with a consumer product safety standard." CPSIA § 232(a)(3).

### 7. Prohibition on the Sale of Certain Products Containing Specified Phthalates

Section 108 of the CPSIA (codified at 15 U.S.C. § 2057c) provides that "[b]eginning on the date that is 180 days after the date of enactment of this Act, it shall be unlawful for any person to manufacture for sale, offer for sale, distribute in commerce, or import into the United States any children's toy or child care article that contains concentrations of more than 0.1 percent of" DEHP, DBP or BBP. CPSIA § 108(a). The provision also contains an interim prohibition on the sale of other types of phthalates. CPSIA § 108(b). Furthermore, "[a] violation of subsection (a) or (b)(1) or any rule promulgated by the Commission under subsection (b)(3) shall be treated as a violation of section 19(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2068(a)(1))." CPSIA

§ 108(c).

Congress went on expressly to specify in section 108(d) that the prohibitions on phthalates, both permanent and interim, were to be treated as consumer product safety standards: "Subsections (a) and (b)(1) and any rule promulgated under subsection (b)(3) shall be considered consumer product safety standards under the Consumer Product Safety Act." Section 108(d) then addresses the scope of preemption of the phthalates standard:

> Nothing in this section or the Consumer Product Safety Act (15 U.S.C. 2051 et seq.) shall be construed to preempt or otherwise affect any State requirement with respect to any phthalate alternative not specifically regulated in a consumer product safety standard under the Consumer Product Safety Act.

11

CPSIA § 108(d).[1]

## D. Implementation of the CPSIA by the CPSC

Following passage of the CPSIA, affected parties had numerous questions regarding the implementation of the new law. On September 4, 2008, the CPSC held its first public meeting at which issues regarding the implementation of the CPSIA were addressed. See Declaration of Mitchell S. Bernard in Support of Plaintiffs' Motion for Summary Judgment ("Bernard Dec."), Ex. J. One of the primary issues that arose was whether various provisions of CPSIA – lead and phthalates in particular – applied to product in inventory or on store shelves prior to the effective date of the provisions. Other than the provision making it unlawful to sell non-compliant cribs already in the stream of commerce (CPSIA § 104), no other provision of the CPSIA expressly addressed the question of the applicability of the new rules to existing inventory.

> CPSC regulations provide that upon written request,
>
> the General Counsel provides written advisory opinions interpreting the acts and administrative regulations . . . the Commission administers, provided the request contains sufficient specific factual information upon which to base an opinion. Advisory opinions represent the legal opinions of the General Counsel and may be changed or superseded by the Commission.

---

[1] It is clear from the legislative history that the phthalate provision was the result of compromise. "On one of the more contentious items dealt with in the conference, a compromise was reached earlier this week to ban three specific phthalates, and place an interim ban on three other phthalates while a formal health assessment is done." 154 Cong. Rec. S7870 (daily ed. July 31, 2008) (statement of Sen. Sununu), at 2008 WL 2938243 (see also 154 Cong. Rec. H7577-01, at H7582 (daily ed. July 30, 2008) (statement of Rep. Barton), at 2008 WL 2917275. One of the other compromises was to provide for federal preemption for those phthalates specifically regulated by the CPSC (providing one standard for all states) (id. at H7581), but leaving states the ability to regulate phthalates that are not regulated under the new legislation and to regulate alternatives to phthalates (id. at H7580) (statement of Rep. Waxman).

12

16 C.F.R. § 1000.7. The Commission administers the Consumer Product Safety Act and the Federal Hazardous Substances Act, among others. See 16 C.F.R. § 1000.2.

In a memorandum to the Acting Chairman of the CPSC dated September 12, 2008, the General Counsel addressed the inventory question in connection with the general lead ban set forth in CPSIA § 101. See Bernard Dec., Ex. J. The September 12, 2008 opinion recognized that Congress made explicit that any children's product containing more than 600 ppm of lead "shall be treated as a banned hazardous substance under the Federal Hazardous Substances Act ('FHSA')," and made it unlawful to "sell, offer for sale, manufacture for sale, distribute in commerce . . ." any product that is a banned hazardous substance under the FHSA. Id. at 1. The opinion concluded that the new lead ban did apply to existing inventory because Congressional intent could be derived from the language of the statute: "Given the strength of congressional language that these products shall be treated as banned hazardous substances and the strong prohibition against their sale, the CPSIA read as a whole suggests that the statutory provisions on lead limits apply to inventory." Id. at 4.

In a letter to the Commission dated November 13, 2008, counsel for several wholesale and retail entities urged the Commission to reconsider the opinion regarding the application to inventory of the lead content ban and to consider not applying the phthalate restrictions of the CPSIA to inventory. Bernard Dec., Ex. A at 1.

The General Counsel of the CPSC responded in a letter dated November 17, 2008 (the "November opinion"). Bernard Dec., Ex. B. The November opinion declined the request to reconsider the prior opinion applying the lead ban to existing inventory as of February 10, 2009. Id. at 1 ("The language Congress wrote does not permit me the flexibility to take into

13

consideration the policy and economic issues that have been raised by you and your unidentified clients as to the potential consequences of requiring products to meet the new stricter lead limits by that date.").

The November opinion then addressed the question of the application of the phthalates provision to inventory. The opinion stated that the legal analysis applicable to phthalates set forth in section 108 of the CPSIA is different from the analysis applicable to the lead ban. Id. at 1. Although section 108 makes it a prohibited act to offer products for sale that contain more than a specified level of certain phthalates, section 108 also indicates that the phthalates provision shall be considered a "consumer product safety standard under the Consumer Product Safety Act." Id. at 1-2. The Consumer Product Safety Act expressly states that consumer product safety standards apply only to products manufactured after the effective date of a new standard. Id. at 2 (citing 15 U.S.C. § 2058(g)(1)). Thus, in concluding that the phthalates provision did not apply to existing inventory, the opinion stated: "The inclusion of a subsection in the phthalates provision specifically stating that the phthalates limit would be treated as a consumer product safety standard appears to reflect a desire to keep the fundamental expectations of the regulatory process consistent with past practice under the statute." Id. The opinion further observed that "Congress could have regulated phthalates in the same manner as lead and chose not to do so." Id. Finally, the opinion noted that in the absence of unambiguous intent by Congress to apply the phthalate standard retroactively, under Landgraf v. USI Film Prods., 511 U.S. 244 (1994), retroactive effect should not be given. Bernard Dec., Ex. B at 2.

On December 2, 2008, plaintiff NRDC wrote to the Commissioners of the CPSC to "petition[] the CPSC to revoke the November 17 decision immediately." Bernard Dec., Ex. H.

14

The December 2 letter asked for a response by December 8, 2008. Id. at 4. The NRDC,

however, did not wait until it received a response or until December 8. Rather, on December 4,

plaintiff filed its complaint in this action. See Docket sheet in 08 Civ. 10507, entry 1. The

CPSC responded to the December 2 letter in a letter to the NRDC dated December 8, 2008,

stating that the petition was referred to the Secretary of the CPSC for processing and setting forth

the procedures for review of petitions by the agency. Bernard Dec., Ex. I. The NRDC petition

remains pending with the Commission.

## ARGUMENT

### THE CPSC'S OPINION REGARDING THE PHTHALATE PROVISION IS ENTITLED TO DEFERENCE AND SHOULD BE UPHELD

The Supreme Court has articulated a two-step analysis to be followed when courts

are confronted with a challenge to an agency's interpretation of a statute that it administers. See

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); see also Rust v.

Sullivan, 500 U.S. 173, 174 (1991); Nat'l Cable & Telecom. Ass'n v. Brand X Internet Serv.,

545 U.S. 967, 980-81 (2005) (applying the standards articulated in Chevron for reviewing an

agency's interpretation of a statute).

> First, always, is the question whether Congress has directly spoken to the precise
> question at issue. If the intent of Congress is clear, that is the end of the matter; for
> the court, as well as the agency, must give effect to the unambiguously expressed
> intent of Congress.

Chevron, 467 U.S. at 842-43 (footnote omitted). See also Chauffeur's Training Sch., Inc. v.

Spellings, 478 F.3d 117, 125 (2d Cir. 2007). In determining whether Congress specifically

addressed the question at issue, a reviewing court looks at the text in context, and then to the

structure, history and purpose of the statute. Cohen v. JP Morgan Chase & Co., 498 F.3d 111,

15

116-117, 121 (2d Cir. 2007). "A court's task is not to infer what Congress might have said about the issue in dispute if it had considered the matter; a court decides only 'whether Congress has directly spoken to [that] precise question.'" Id. at 121, quoting Chevron. When the statute does not address the precise question at issue, the Court turns to the second step and determines the nature and extent of the deference owed to the agency's interpretation of the ambiguous statute. See In re New Times Sec. Servs., Inc., 371 F.3d 68, 80-83 (2d Cir. 2004) (after determining that precise issue not addressed by statute, Court analyzed whether Chevron or lesser form of deference due to agency's interpretation).

A.    The Phthalate Provision of the CPSIA Cannot Be
      Read To Apply Unambiguously to Existing Inventory

The language, context, and structure of the statute confirms that plaintiffs' reading – that the phthalates provision operates as a ban on sales of existing inventory – is neither the only nor even the most plausible reading of the provision. A court must "consider the statute's text and its structure to determine the legislative objective." Smith v. Doe, 538 U.S. 84, 92 (2003); see Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 596 (2004) ("statutory language must be read in context since a phrase gathers meaning from the words around it"); Cohen v. JP Morgan Chase & Co., 498 F.3d at 117-18. If upon such consideration "there are two plausible but different interpretations of statutory language, there is ambiguity." Khan v. United States, 548 F.3d 549, 556 (7th Cir. 2008).

With respect to the precise question at issue here – whether the phthalates provision is applicable to existing inventory – section 108 is silent. Plaintiffs insist that the provision constitutes a "ban" on phthalates, such that it applies to the sale of existing inventory.

16

Pl. Br. at 9-10. In fact, however, the operative language of section 108(a) nowhere mentions a ban, but rather refers to a "prohibition." This choice of language is in direct contrast to the language chosen by Congress for the lead provisions of section 101. Section 101(a) refers to a "General Lead Ban," and section 101(a)(1) designates the ban for "Treatment as a Banned Hazardous Substance." Congress's choice not to call the phthalate prohibition a ban, when it did elsewhere in the same statute, must be presumed purposeful. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (internal cite and quotation marks omitted).

Indeed, plaintiffs focus on one provision of section 108 in isolation, yet section 108 goes on expressly to state that the subsections on phthalates, both interim and permanent, embodied in sections 108(a) & (b) shall be considered consumer product safety standards under the CPSA. CPSIA § 108(d). Congress chose not to designate the phthalate containing products as banned hazardous products under the Consumer Product Safety Act (under 15 U.S.C. § 2057) or banned hazardous substances under the Federal Hazardous Substances Act (15 U.S.C. § 1261(q)(1)). In making that choice, Congress ruled out consideration of the provision as a ban under either of those statutes and triggered the provisions of the Act applicable to consumer product safety standards. Such standards, as set forth above, are applicable only to products manufactured after the effective date. See 15 U.S.C. § 2058(g).

Plaintiffs contend that the "logical explanation" for Congress's reference to consumer product safety standards in section 108(d) is to adopt the preemption regime applicable

17

to standards. Pl. Br. at 13-15. That explanation, however, is not so logical. Had Congress been interested only in preemption, the FHSA also contains a preemption provision. 15 U.S.C. § 1261 Note (b)(1)(B). Unlike the CPSA, the FHSA contains no mandatory provision, comparable to 15 U.S.C. § 2058(g), requiring its application only to products manufactured after the effective date.[2] Thus, if Congress's goal was to adopt preemption and avoid prospective application, it could have invoked the FHSA, as it did with the lead ban. In any event, had Congress intended the cramped meaning of "standard" put forward by plaintiffs, one would expect that limitation to be explicit.[3] Otherwise, a standard is a standard.

Plaintiffs further contend that section 108's express prohibition on the sale, offer for sale, and distribution in commerce of certain phthalate-containing products after the effective date demonstrates Congress's unambiguous intent to apply the prohibition to the sale of inventory. Pl. Br. at 9-10. But that language in section 108 simply mirrors the "prohibited acts" language that is already contained in the CPSA, 15 U.S.C. § 2068(a), applicable to both standards and bans. Thus, the inclusion of language barring sales after the effective date does not necessarily mean that Congress intended to impose a ban on the sale of existing inventory. The

---

[2]    Plaintiffs' contention that 15 U.S.C. § 2058(g) is inapplicable to Congressionally mandated standards, Pl. Br. at 12, is misguided. Congress itself designated the phthalate provisions as standards under the CPSA, thereby incorporating these new provisions into the existing framework. The Commission is not claiming here that Congress could not have overridden the terms of section 2058(g) and applied the phthalate ban to inventory; rather, the Commission claims that Congress simply did not do so. Accordingly, section 2058(g) is applicable to the phthalate standard.

[3]    Congress has in fact expressly modified the provisions applicable to a consumer product safety standard in at least one instance. In legislating standards for bicycle helmets, Congress directed that sections 7, 9 & 11 (15 U.S.C. §§ 2056, 2058 & 2060) shall not apply to the final standard. See 15 U.S.C. § 6004(c)(4). Congress could have made a similar exclusion here but did not do so.

18

language relied upon by plaintiffs cannot convert a standard into a ban.

Indeed, when Congress wished to make clear that a standard applied to inventory, Congress did so explicitly. For example, in section 104, which directed the Commission to promulgate consumer product safety standards for durable nursery products, Congress included a specific provision applicable to cribs, making it unlawful for any person "to sell or resell, lease, sublet, offer, provide for use, or otherwise place in the stream of commerce" a crib that is not in compliance with a promulgated standard. CPSIA § 104(c). No similar reference to the stream of commerce is included in section 108. Similarly, with respect to lead, Congress specified that the provision was a ban and subject to treatment under the FHSA, thus eliminating any question as to whether the ban applied to inventory. Congress chose to treat phthalates differently.

A review of the legislative history yields no greater clarity than the text in discerning Congress's meaning. See Mizrahi v. Gonzales, 492 F.3d 156, 166 (2d Cir. 2007) (although Second Circuit "has been reluctant to employ legislative history at step one of Chevron analysis," court reviewed relevant legislative history and found it ambiguous). The legislative history is absolutely silent on the subject. No mention was made by any legislator regarding the applicability of the phthalates provision to existing inventory notwithstanding the fact that the CPSIA went to conference and was the product of much negotiation and compromise. 154 Cong. Rec. S7867-78 (daily ed. July 31, 2008); H7577-88 (daily ed. July 30, 2008); H.R. Conf. Rep. No. 787, 100th Cong., 2d Sess. 65 (2008) .[4] Ultimately, the statute and legislative history are

_____

[4] The post-hoc statements by legislators relied upon by plaintiffs do not provide a reliable indication of Congressional intent and are entitled to little if any weight. See Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118-19 (1980) (statement by legislator after the fact not entitled to "much weight"). Indeed, the D.C. Circuit has determined that "post-enactment statements of legislators involved in the enactment process ... have no

19

silent on the precise question at issue in this case. Such "silence . . . creates ambiguity."

American Forest & Paper Ass'n v. FERC, No. 07-1328, 2008 WL 5335580, at *2 (D.C. Cir. Dec. 23, 2008). In the absence of any clear direction from Congress, Congress left a "gap for the agency to fill." Chevron, 467 U.S. at 842-43.

## B. The Commission's Interpretation is Entitled to Deference

Under bedrock principles of administrative law, courts accord deference to an interpretation of a statute adopted by the agency that has been "charged with responsibility for administering the provision" by Congress. Chevron, 467 U.S. at 865; see also Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 739 (1996) ("It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering."). Courts give weight to the agency's interpretation of a statute it administers because of the "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." Smiley, 517 U.S. at 740-41.

Although some deference is always accorded to an agency's interpretation of a statute it administers, the level of deference varies. If Congress delegated authority to an agency to make rules with the force of law and the agency acted pursuant to that delegated authority in interpreting the statutory scheme, then courts review that statutory interpretation under the

---

probative weight and represent only the personal views of the legislator." Petit v. U.S. Dep't of Education, 578 F. Supp. 2d 145, 158 (D.D.C. 2008) (quoting Petry v. Block, 697 F.2d 1169, 1171 (D.C. Cir. 1983)).

20

standards set forth in <u>Chevron</u>. <u>See</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001). Under <u>Chevron</u>, if the statute is silent or ambiguous on the matter at issue, the courts will uphold the agency's interpretation if it "is based on a permissible construction of the statute." 467 U.S. at 843; <u>see also</u> <u>Mead</u>, 533 U.S. at 229 (under <u>Chevron</u>, "reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise"); <u>Rust v. Sullivan</u>, 500 U.S. at 184 (agency's statutory construction will not be disturbed if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent").

            Even if the phthalate opinion is not entitled to deference under <u>Chevron,</u> courts at a minimum accord deference to the agency's statutory interpretation under the standards set forth in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). <u>See</u> <u>Mead</u>, 533 U.S. at 234-35; <u>Schneider v. Feinberg</u>, 345 F.3d 135, 143 (2d Cir. 2003) ("Interpretive guidelines that lack the force of law but nevertheless 'bring the benefit of [an agency's] specialized experience to bear' on the meaning of a statute, are still entitled to 'some deference.'" (quoting <u>Mead</u>, 533 U.S. at 234-35)). In <u>Skidmore</u>, the Supreme Court recognized that agency interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140. The Supreme Court therefore held that such agency interpretations are given "considerable and in some cases decisive weight," depending upon the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." <u>Id.</u>; <u>See also</u> <u>In re New Times Sec. Servs.</u>, 371 F.3d at 83; <u>Cmty. Health Ctr. v. Wilson-Coker</u>, 311 F.3d 132, 138

(2d Cir. 2002) (outlining factors that inform Skidmore analysis, including "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments.").

In this case, the General Counsel's opinion in the face of the statute's ambiguity is entitled to deference. That the CPSC is the expert agency charged with enforcement and implementation of the CPSIA and prior acts is not in dispute. See CPSIA § 3; 15 U.S.C. § 2053; 16 C.F.R. §§ 1000.1, 1000.2, and part 1009; see also Complaint ¶ 13 ("Defendant CPSC, a federal agency of the United States, is charged with responsibility for the implementation and administration of the relevant provisions of the law."). Nor is there any doubt that the General Counsel was authorized to render an opinion interpreting the CPSIA. 16 C.F.R. § 1000.7.

The November opinion of the General Counsel is the product of careful analysis, considered agency expertise on statutory terms, and is persuasive. First, it is clear from consideration of the two opinions issued by the General Counsel – the September opinion regarding lead and the November opinion regarding phthalates – that the General Counsel gave extensive and nuanced consideration to the question of the applicability of those two provisions of the CPSIA to existing inventory. With respect to lead, the General Counsel determined that the language of the statute compelled the conclusion that Congress intended the lead provisions to constitute a ban, given that Congress expressly stated that lead-containing products would be treated as banned hazardous substances under the FHSA. See Bernard Dec. Ex. J at 1; Ex. B at 1.

The November opinion approached the phthalate provisions differently, given the very different language used by Congress. The opinion recognized the important distinction that

22

Congress made by making the limit on lead a ban under the FHSA and declining to do so with respect to phthalates. Id. Ex. B at 2. Moreover, as the opinion recognized, Congress designated the phthalate prohibition a standard under the CPSA, and the CPSA expressly states that consumer product safety standards apply only to products manufactured after the effective date. Id. at 1-2. Thus, the opinion concluded: "By treating phthalates differently from lead and making the limit on phthalates a consumer product safety standard, Congress did not evidence clear congressional intent to apply that standard retroactively and displace the ordinary treatment of such standards on a prospective basis." Id.

The November opinion offers a thoughtful, expert and persuasive interpretation of the statute and is therefore entitled to deference. See In re new Times Sec. Servs., Inc., 371 F.3d at 83 (persuasiveness of SEC's interpretation in informal opinion weighs in favor of deference to SEC's reading of statute). It correctly concluded that a standard is a standard under the CPSA, unless Congress expressly states otherwise. The provisions governing standards are clear: "A consumer product safety standard shall be applicable only to consumer products manufactured after the effective date." 15 U.S.C. § 2058(g). The legislative history on that provision, which dates back to 1972, could not be more unambiguous: "The Commission could not establish a retroactive effective date for any consumer product safety rule which embodies a product safety standard. Rules declaring a product to be a banned hazardous consumer product, however, may apply to products of new manufacture or to products already distributed in commerce." House Committee Report, 92-1153 to accompany H.R. 15003 (June 20, 1972) (attached, at 37). If Congress intended to treat the new phthalate standard differently from other standards, such that it would apply to products manufactured before the effective date, it easily could have done so.

23

But Congress's choice not to do so is determinative. The Court should therefore defer to the expert agency and adopt the CPSC's reading of the statute.

Finally, the Court should defer to the agency's interpretation of the CPSIA for the additional reason that it properly considered the law pertaining to retroactive effect of statutes. "A statute that is silent 'with respect to retroactive application is construed under [the Supreme Court's] precedent to be unambiguously prospective' in effect." Martinez v. INS, 523 F.3d 365, 372 (2d Cir. 2008) (quoting INS v. St. Cyr, 533 U.S. 289, 320 n.45 (2001)).

As the Supreme Court has explained, "every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." Landgraf, 511 U.S. at 269 (internal cite and quote omitted). Here, although the phthalates provision, even under plaintiffs' argument, does not apply to sales before the effective date, application of the phthalates ban to existing inventory would have retroactive effect. Thus, in the absence of an express statement by Congress that it intended for the provision to apply in this manner, the Commission appropriately rejected such application. Id. at 273.

Plaintiffs insist that the phthalate provision must be read as a ban applicable to inventory in order to effectuate the purpose of the law. Pl. Br. at 10. But, the Supreme Court has made clear that the stated purpose of the law is not dispositive:

> It may frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal.

24

Landgraf, 511 U.S. at 285-86. Here, there can be no doubt that the statute at issue was the

product of compromise. Plaintiffs' attempt to rewrite the statute in a manner that they believe

would better reflect the purposes of the statute should be rejected.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be

denied and defendant's cross-motion for summary judgment dismissing the complaint should be

granted.

Dated:   New York, New York
         January 9, 2009

GREGORY G. KATSAS                        LEV L. DASSIN
Assistant Attorney General               Acting United States Attorney for the
                                         Southern District of New York

EUGENE M. THIROLF
Director                                          /s/

                                    By:  BETH E. GOLDMAN
DRAKE CUTINI                             Assistant United States Attorney
Attorney, Office of Consumer Litigation  86 Chambers Street, 3rd Floor
U.S. Department of Justice               New York, New York 10007
                                         Telephone: (212) 637-2732

SAFETY COMMISSION.
**Office of the** GENERAL Counsel

# CONSUMER PRODUCT SAFETY ACT

---

JUNE 20, 1972.—Committed to the Committee of the Whole House and
ordered to be printed

---

Mr. STAGGERS, from the Committee on Interstate and Foreign
Commerce, submitted the following

# REPORT

together with

# MINORITY VIEWS

[To accompany H.R. 15003]

The Committee on Interstate and Foreign Commerce, to whom was
referred the bill (H.R. 15003) to protect consumers against unreason-
able product hazards, having considered the same, report favorably
thereon with an amendment and recommend that the bill as amended
do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert the following:

### SHORT TITLE: TABLE OF CONTENTS

SECTION 1. This Act may be cited as the "Consumer Product Safety Act".

### TABLE OF CONTENTS

Sec. 1. Short title: table of contents.
Sec. 2. Findings and purposes.
Sec. 3. Definitions.
Sec. 4. Consumer Product Safety Commission.
Sec. 5. Product safety information and research.
Sec. 6. Public disclosure of information.
Sec. 7. Consumer product safety standards.
Sec. 8. Banned hazardous products.
Sec. 9. Administrative procedure applicable to promulgation of consumer product safety
         rules.
Sec. 10. Petition by interested party for consumer product safety rule.
Sec. 11. Judicial review of consumer product safety rules.
Sec. 12. Imminent hazards.
Sec. 13. New products.
Sec. 14. Product certification and labeling.
Sec. 15. Notification and repair, replacement, or refund.
Sec. 16. Inspection and recordkeeping.
Sec. 17. Imported products.
Sec. 18. Exports.
Sec. 19. Prohibited acts.
Sec. 20. Civil penalties.
Sec. 21. Criminal penalties.
Sec. 22. Injunctive enforcement and seizure.
Sec. 23. Suits for damages by persons injured.
Sec. 24. Private enforcement of product safety rules and of section 15 orders.

65–006

(1)

2

Sec. 25. Effect on private remedies.
Sec. 26. Effect on State standards.
Sec. 27. Additional functions of Commission.
Sec. 28. Product Safety Advisory Council.
Sec. 29. Cooperation with States and with other Federal agencies.
Sec. 30. Transfers of functions.
Sec. 31. Limitation on jurisdiction.
Sec. 32. Authorization of appropriations.
Sec. 33. Effective date.

## FINDINGS AND PURPOSES

SEC. 2. (a) The Congress finds that—

(1) an unacceptable number of consumer products which contain unreasonable hazards are distributed in commerce ;

(2) complexities of consumer products and the diverse nature and abilities of consumers using them frequently result in an inability of users to anticipate hazards and to safeguard themselves adequately ;

(3) the public should be protected against unreasonable hazards associated with consumer products ;

(4) control by State and local governments of unreasonable hazards associated with consumer products is inadequate and may be burdensome to manufacturers ; and

(5) regulation of consumer products the distribution or use of which affects interstate or foreign commerce is necessary to carry out this Act.

(b) The purposes of this Act are—

(1) to protect the public against unreasonable hazards associated with consumer products ;

(2) to assist consumers in evaluating the comparative safety of consumer products ;

(3) to develop uniform safety standards for consumer products and to minimize conflicting State and local regulations ; and

(4) to promote research and investigation into the causes and prevention of product-related deaths, illnesses, and injuries.

## DEFINITIONS

SEC. 3. (a) For purposes of this Act :

(1) The term "consumer product" means any article, or component part thereof, produced or distributed (1) for sale to a consumer for use in or around a household or residence, a school, in recreation, or otherwise, or (ii) for the personal use, consumption or enjoyment of a consumer in or around a household or residence, a school, in recreation, or otherwise ; but such term does not include (A) any article which is not customarily produced or distributed for sale to or use, consumption, or enjoyment of a consumer ; (B) tobacco and tobacco products, (C) motor vehicles or motor vehicle equipment (as defined by sections 102 (3) and (4) of the National Traffic and Motor Vehicle Safety Act of 1966), (D) economic poisons (as defined by the Federal Insecticide, Fungicide, and Rodenticide Act), (E) any article which, if sold by the manufacturer, producer, or importer, would be subject to the tax imposed by section 4181 of the Internal Revenue Code of 1954 (determined without regard to any exemptions from such tax provided by section 4182 or 4221, or any other provision of such Code), or any component of any such article, (F) drugs, devices, or cosmetics (as such terms are defined in sections 201 (g), (h), and (i) of the Federal Food, Drug, and Cosmetic Act), or (G) food. The term "food", as used in this paragraph, means all "food", as defined in section 201 (f) of the Federal Food, Drug, and Cosmetic Act, including poultry and poultry products (as defined in sections 4 (e) and (f) of the Poultry Products Inspection Act), meat, meat food products (as defined in section 1 (j) of the Federal Meat Inspection Act), and eggs and egg products (as defined in section 4 of the Egg Products Inspection Act).

(2) The term "consumer product safety rule" means a consumer product safety standard described in section 7(a), or a rule under this Act declaring a consumer product a banned hazardous product.

(3) The term "hazard" means a risk of death, personal injury, or serious or frequent illness.

(4) The term "manufacturer" means any person who manufactures or imports a consumer product.

*Publication of Proposed Rule*

Section 7(f) mandates that the Commission act within 210 days after publication of the original notice initiating a proceeding for the development of a standard to (1) withdraw the notice of proceeding. or (2) publish a proposed rule which either proposes a consumer product safety standard applicable to the product or proposes to declare the product a banned hazardous product. The Commission may extend the 210 day period for good cause shown.

*Banned Hazardous Products*

Section 8 grants authority to the Commission to administratively ban hazardous consumer products if it finds that the product presents an unreasonable hazard and that no feasible consumer safety standard would adequately protect the public from the hazard. Section 9(c)(2) requires that these findings must be affirmatively made and incorporated in any adopted rule which declares a product to be a banned hazardous consumer product. The Commission need not attempt to first develop a proposed standard to deal with the hazard under section 7, but may proceed directly to ban a hazardous product. Interested persons may obtain judicial review under section 11 of a banning rule and may thereby require the Commission to support with substantial evidence its finding that no feasible standard would adequately protect the public.

*Administrative Procedures Applicable to Promulgation of Consumer Product Safety Rules*

Section 9 requires the Commission to act to either adopt a final rule or withdraw the proposed rule within 60 days of publication of any proposed consumer product safety rule under this act. If the Commission determines to withdraw the proposed rule, it must find that withdrawal is in the public interest, or that the proposed rule is not reasonably necessary to prevent or reduce the hazard associated with the product. The 60-day period may be extended by the Commission for good cause shown.

Consumer product safety rules under this bill are to be promulgated pursuant to section 553 of title 5 of the United States Code. The committee has modified the informal rulemaking procedures of the Administrative Procedure Act by requiring that the Commission give interested persons an opportunity for the oral presentation of views, data, or arguments in addition to providing an opportunity for the submission of written comments. Also, a transcript must be kept of this proceeding to assure that the views of participating parties will be preserved and available to a reviewing court under section 11.

In traditional agency rulemaking, it is discretionary with the agency whether to provide an oral hearing under section 553 of title 5. Your committee has decided to remove that discretion and make mandatory that interested persons be afforded an opportunity to orally present arguments to the Commission. In so doing, the Committee sought to reach an accommodation between the informal requirements of section 553 and the formal trial type procedures of sections 556 and 557 of title 5. The informal procedures were not thought to provide the desired opportunity for interested parties to participate in the Commission's rulemaking proceeding; the formal, on the other hand, were thought to unduly involve the Commission

in adjudicatory procedures inappr
nature of the rulemaking procedu
crafted an administrative procedu
it believes will maximize opport
making proceeding without und
trial type procedures.

Consumer product safety rules
of the hazard the rule is designed
rule's effective date. Rules are re
180 days from the date issued un
cause that a later effective date
product safety standards may be
products which are manufactured
gated. Thus the Commission
effective date for any consumer p
product safety standard. Rules
hazardous consumer product, how
manufacture or to products alrea

In determining whether to pr
safety rule the Commission is di
available to it including the resul
and investigation activities. The
appropriate findings to be includ
(1) the nature and degree of the
of consumer products or types on
are to be made subject to the rule,
products which are subject t
of the rule upon the utility, co

As a condition precedent to iss
the Commission must make findi
effective date) is reasonably nece
sonable hazard to the public and
in the public interest. In instanc
to be a banned hazardous prod
affirmative finding that no feasil
would adequately protect the pub

*Amendment and Revocation of*

Under section 9(c) the Com
amending or revoking any cons
promulgated. An amendment or
days unless the Commission ex
the amendment involves a mat
safety rule, the Commission mus
for the promulgation of rules
example, where the Commission
ment in a rule which embodies
it must publish notice under sec
offer to develop an amended sta
mission proposes to revoke a ru
the oral presentation of views,
submissions in accordance with
rule may only be revoked if
rule is no longer reasonably nec

in adjudicatory procedures inappropriate to the essentially legislative nature of the rulemaking procedure. The committee has accordingly crafted an administrative procedure to be employed in this bill which it believes will maximize opportunities to participate in the rulemaking proceeding without unduly entangling the Commission in trial type procedures.

Consumer product safety rules are required to express the nature of the hazard the rule is designed to prevent or reduce and state the rule's effective date. Rules are required to take effect not more than 180 days from the date issued unless the Commission finds for good cause that a later effective date is in the public interest. Consumer product safety standards may be made applicable only to consumer products which are manufactured after the date a standard is promulgated. Thus the Commission could not establish a retroactive effective date for any consumer product safety rule which embodies a product safety standard. Rules declaring a product to be a banned hazardous consumer product, however, may apply to products of new manufacture or to products already distributed in commerce.

In determining whether to promulgate a final consumer product safety rule the Commission is directed to consider all relevant data available to it including the results of research, development, testing, and investigation activities. The Commission is instructed to make appropriate findings to be included in any final rule with respect to (1) the nature and degree of the hazard, (2) the approximate number of consumer products or types or classes of consumer products which are to be made subject to the rule, (3) the public need for the consumer products which are to be subject to the rule and (4) the probable effect of the rule upon the utility, cost, or availability of such product.

As a condition precedent to issuing a consumer product safety rule, the Commission must make findings that (1) the rule (including the effective date) is reasonably necessary to prevent or reduce an unreasonable hazard to the public and (2) the promulgation of the rule is in the public interest. In instances where the rule declares a product to be a banned hazardous product, the Commission must make an affirmative finding that no feasible consumer product safety standard would adequately protect the public.

## Amendment and Revocation of Consumer Product Safety Rules

Under section 9(e) the Commission is permitted to adopt rules amending or revoking any consumer product safety rule which it has promulgated. An amendment or revocation must take effect within 180 days unless the Commission extends the period for good cause. If the amendment involves a material change in a consumer product safety rule, the Commission must observe the full procedures required for the promulgation of rules contained in sections 7, 8, and 9. For example, where the Commission proposes to make a material amendment in a rule which embodies a consumer product safety standard, it must publish notice under section 7 and invite interested persons to offer to develop an amended standard. In instances where the Commission proposes to revoke a rule, it must provide an opportunity for the oral presentation of views, data, and arguments and for written submissions in accordance with the provisions of section 9(a)(2). A rule may only be revoked if the Commission determines that the rule is no longer reasonably necessary to prevent or reduce the hazard.

38

Persons adversely affected or any consumer or consumer organization may obtain judicial review under section 11 of any rule which materially amends or revokes an existing consumer product safety rule.

## Petition by Interested Parties for Consumer Product Safety Rules

Section 10 establishes a mechanism for interested persons to petition the Commission to commence a proceeding to issue, amend, or revoke a consumer product safety rule. The right to petition agency action is, of course, fundamental and already a part of the Administrative Procedure Act (5 U.S.C. 553(e)). This section would add to that privilege by requiring the Commission to explain its reasons if it determines to deny the petition. As a result, interested persons are given a means of requiring the Commission to explain the basis for inaction with respect to a particular product or class of consumer products.

## Judicial Review of Consumer Product Safety Rules

Section 11 provides a procedure under which any person adversely affected by a consumer product safety rule or any consumer or consumer organization may obtain judicial review of the rule upon application to a U.S. court of appeals within 60 days following promulgation of the rule. The reviewing court, upon application of the petitioner, may order the Commission to adduce additional data, views, or arguments. Commission rules are to be overturned unless each of the findings which the Commission is required to make under section 9(c) is shown to be supported by "substantial evidence" on the record taken as a whole. Thus, although the Commission's rule-making proceeding is permitted to follow the informal procedures of section 553 of title 5 of the U.S. Code (subject to the further requirement that the Commission afford an opportunity for the oral presentation of views, data, and arguments) its determinations are subjected to the stricter standard of review that is normally reserved for formal agency proceedings under sections 556 and 557 of title 5.

Judicial review under this section is in addition to, not in lieu of, other legal rights or remedies. Accordingly, this section should not be interpreted as abridging in any way a person's right to collaterally attack a product safety rule to the extent otherwise provided by law in civil or criminal proceedings brought after the expiration of the 60-day period. Nor should the failure to subject other Commission rules or orders to review under this section be read as derogating from customary rights of judicial review of such rules and orders which are made available under applicable provisions of the Administrative Procedure Act (5 U.S.C. 701–06).

## Imminent Hazards

Section 12 gives the Commission emergency authority to deal with hazardous products which present an imminent and unreasonable risk of death, serious illness, or severe personal injury. In such circumstances the Commission may file an action in U.S. district court to seize and condemn the offending product and may bring an action against any manufacturer, distributor, or retailer of the product for such equitable remedy as may be necessary to adequately protect the public from the hazard.