UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL RESOURCES DEFENSE
COUNCIL, INC. and PUBLIC CITIZEN,
INC.,

                         Plaintiffs,

           - against -

U.S. CONSUMER PRODUCT SAFETY
COMMISSION,

                         Defendant.

**MEMORANDUM OPINION
AND ORDER**

08 Civ. 10507 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On August 14, 2008, Congress enacted the Consumer Product Safety

Improvement Act of 2008 (Pub. L. No. 110-314 (HR 4040)) (the "CPSIA"), which

amends the Consumer Product Safety Act of 1972, 15 U.S.C. §§ 2051 et seq. (the

"CPSA"). At issue in this lawsuit are Sections 108(a) and 108(b)(1) of the CPSIA, which

make it unlawful to "offer for sale . . . [or] distribute in commerce . . . any children's toy

or child care article that contains concentrations of more than 0.1 percent of" certain

chemicals known as phthalates "[b]eginning on" February 10, 2009. 15 U.S.C.

§§ 2057c(a), (b)(1).

The General Counsel of Defendant United States Consumer Product

Safety Commission (the "Commission"), the agency charged with enforcing the CPSA,

has issued an advisory opinion letter stating that products violative of Sections 108(a) and

108(b)(1) may continue to be sold and distributed in commerce after February 10, 2009,

as long as these products were manufactured prior to February 10, 2009. (Bernard Decl.

Ex. B) In this suit, Plaintiffs seek a declaration that the opinion letter "constitutes agency

action not in accordance with law in violation of the [Administrative Procedure Act],

5 U.S.C. §§ 702, 704, and 706(2)(A), and the CPSA, 15 U.S.C. § 2057c, as amended by

the CPSIA." (Cmplt. ¶¶ 27-29) The parties have filed cross-motions for summary

judgment on Plaintiffs' claim. (Docket Nos. 12 and 13)

## DISCUSSION

### I.    BACKGROUND

#### A.    Phthalates and Section 108 of the CPSIA

Phthalates are a class of chemicals used to soften plastics and are

commonly found in children's toys and other products, including in bath toys, books,

teethers, bibs, dolls, plastic figures, and other plastic toys.[1] (Pltf. Rule 56.1

Statement ¶ 8) Phthalates leach steadily from the materials to which they are added, and

may be absorbed through the mouth or skin. (Id. ¶ 8; Janssen Decl. ¶¶ 12, 23) Phthalates

have also been shown to leach from products and bind to dust particles that can be

inhaled or ingested. (Id.; Janssen Decl. ¶ 23)

Scientific studies show that phthalates can have a variety of toxic effects.

For example, phthalates interfere with the production of the steroid sex hormones,

including testosterone. (Janssen Decl. ¶¶ 14-15) Interference with reproductive

hormones has been associated in males with alterations in the onset of puberty, poor

sperm quality, infertility, and testicular cancer. (Id. ¶¶ 15, 18) Animal studies indicate

that exposure to phthalates in utero can cause birth defects to genitalia. (Id. ¶ 19)

Animal studies also link certain phthalates to alterations in female sex hormones

---

[1] The facts concerning phthalates are drawn from Plaintiffs' Statement of Undisputed
Material Facts and the December 9, 2008 Declaration of Sarah Janssen, M.D., Ph.D.,
M.P.H. The Commission has not contested these facts for purposes of this proceeding.

and pregnancy loss, earlier puberty in girls, and the growth of human breast cancer cells. (Id. ¶¶ 20-21)

There is scientific evidence that essentially all children over the age of 6 years old and all adults in the United States have measureable levels of phthalate metabolites in their bodies. (Pltf. Rule 56.1 Statement ¶ 11; Janssen Decl. ¶ 12) Children ages 6 to 11 have the highest levels of three specific phthalates. (Id.) Although there is little information concerning the exposure levels of younger children and infants, they are likely to be as highly exposed as older children because they are also in frequent contact with products containing phthalates. (Janssen Decl. ¶ 12) Exposure to phthalates during childhood is of particular concern, because infants and children are more susceptible to the toxic effects of chemicals, and children are also more likely to place objects, including toys, in their mouths. (Pltf. Rule 56.1 Statement ¶ 10; Janssen Decl. ¶ 17) Moreover, any disruption of a child's natural hormonally-driven development can cause long-term and irreversible reproductive (and other) damage. (Janssen Decl. ¶ 17)

Section 108 of the CPSIA, entitled "Prohibition on sale of certain products containing specified phthalates," establishes a framework for the federal regulation of children's toys and child care products containing phthalates. Section 108 is codified as a new section of the CPSA at 15 U.S.C. § 2057c. Because the pending motions concern the proper interpretation of Section 108, its five subsections are described in detail below.

Section 108(a) permanently prohibits the manufacture and sale of products containing three specific phthalates:

> Beginning on the date that is 180 days after August 14, 2008 [i.e., February 10, 2009], it shall be unlawful for any person to manufacture for

sale, offer for sale, distribute in commerce, or import into the United States any children's toy or child care article that contains concentrations of more than 0.1 percent of di-(2-ethylhexyl) phthalate (DEHP), dibutyl phthalate (DBP), or benzyl butyl phthalate (BBP).  (15 U.S.C. § 2057c(a)).

Section 108(b) creates an interim prohibition on the manufacture and sale of products containing three additional phthalates, and further directs the Commission to appoint a Chronic Hazard Advisory Panel to study those phthalates (and all other phthalates and phthalate alternatives[2] used in children's toys and child care articles) in order to determine whether they should be declared banned hazardous products under Section 2057 of the CPSA.  15 U.S.C. §§ 2057c(b)(1)-(3).  Section 108(b)(3) provides that 180 days after the panel has issued its report, the Commission, pursuant to the Administrative Procedure Act, 5 U.S.C. § 553, shall promulgate a final rule determining whether the interim prohibition will continue in effect and whether "any children's product containing any phthalates [should be] a banned hazardous product."  15 U.S.C. § 2057c(b)(3)(B).

The interim prohibition is contained in Section 108(b)(1):

Beginning on the date that is 180 days after August 14, 2008 [i.e., February 10, 2009], and until a final rule is promulgated under paragraph (3) [of section 108(b)], it shall be unlawful for any person to manufacture for sale, offer for sale, distribute in commerce, or import into the United States any children's toy that can be placed in a child's mouth or child care article that contains concentrations of more than 0.1 percent of diisononyl phthalate (DINP), diisodecyl phthalate (DIDP), or di-n-octyl phthalate (DnOP).  (15 U.S.C. § 2057c(b)(1)).

Sections 108(a) and 108(b)(1) are the key provisions at issue in this action, and will be referred to collectively as the "phthalate prohibitions."

---

[2]  Section 108(e)(1)(A) defines "phthalate alternative" as "any common substitute to a phthalate, alternative material to a phthalate, or alternative plasticizer."  15 U.S.C. § 2057c(e)(1)(A).

4

Sections 108(c) and 108(d) tie the phthalate prohibitions and any rules promulgated under Section 108(b)(3) to certain pre-existing provisions of the CPSA. Section 108(c) states that any violation of those prohibitions or rules "shall be treated as a violation of section 19(a)(1) of the Consumer Product Safety Act (15 U.S.C. 2068(a)(1))." 15 U.S.C. § 2057c(c). Section 108(d) – entitled "Treatment as consumer product safety standards; effect on State laws" – provides that those prohibitions and rules:

> shall be considered consumer product safety standards under the Consumer Product Safety Act. Nothing in this section or the Consumer Product Safety Act (15 U.S.C. 2051 et seq.) shall be construed to preempt or otherwise affect any State requirement with respect to any phthalate alternative not specifically regulated in a consumer product safety standard under the Consumer Product Safety Act. (15 U.S.C. § 2057c(d)).

Section 108(e) defines various terms, including "children's toy" and "child care article," and provides additional guidelines for determining whether a consumer product falls within those definitions. See 15 U.S.C. § 2057c(e). The Court will refer to the children's toys and child care articles that fall within the scope of the phthalate prohibitions as the "covered products."

**B.      The November 17, 2008 Opinion Letter**

In a letter to the Commission dated November 13, 2008, the law firm Arent Fox LLP – on behalf of "several wholesale and retail entities" who wished to "remain anonymous" – asked the Commission to (1) reconsider an earlier advisory opinion that the CPSIA's new lead content restrictions apply "to inventory of children's products containing lead as of February 10, 2009"; and (2) "consider not applying the phthalates restrictions set forth in Section 108 of the CPSIA retroactively to inventory as of February 10, 2009." (Bernard Decl. Ex. B at 1) In an advisory opinion dated

November 17, 2008, the Commission's General Counsel declined to reconsider her earlier opinion concerning the lead restrictions, but opined that the phthalate prohibitions are different in nature from the lead restrictions, and do not apply to products manufactured prior to February 10, 2009 (referred to hereafter as "existing inventory"). (Id. at 1-2)

The General Counsel offered three reasons to support her opinion. First, she noted that Section 108(d) of the CPSIA provides that the phthalate prohibitions "shall be considered . . . consumer product safety standards" under the CPSA. The General Counsel further noted that 15 U.S.C. § 2058(g)(1) – a separate, pre-existing provision of the CPSA – states in part that "[a] consumer product safety standard shall be applicable only to consumer products manufactured after the effective date." (Bernard Decl. Ex. B at 1-2) Accordingly, the General Counsel concluded that Congress did not intend to prohibit the sale of children's products in existing inventory that violated the phthalate prohibitions.

Second, the General Counsel noted that Congress treated phthalates differently from lead, in that it declared "any children's product" containing certain amounts of lead to be a "banned hazardous substance" under the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1278a(a)(1), but did not make a similar declaration with respect to products containing phthalates. (Id. at 2) Arguing that there is no inventory exception under the FHSA, the General Counsel stated that "Congress could have regulated phthalates in the same manner as lead and chose not to do so." (Id.)

Finally, the General Counsel found that applying the phthalate prohibitions to existing inventory would have a retroactive effect under Landgraf v. USI

<u>Film Prods.</u>, 511 U.S. 244 (1994), and that because Congress had not unambiguously stated that the prohibitions should be applied retroactively, such an interpretation should be avoided.  (Bernard Decl. Ex. B at 2)

The General Counsel's position on this issue has been repeatedly confirmed by the Commission.  On November 18, 2008, for example, the Commission's Acting Chairman, Nancy Nord, issued a public statement that the phthalate prohibitions would not apply to products manufactured before February 10, 2009.  (<u>See</u> Bernard Decl. Ex. C)  And on December 4, 2008, the Commission posted a statement on its website confirming its position that the phthalate prohibitions "only appl[y] to products that are manufactured on or after February 10, 2009."  (<u>Id.</u> Ex. D)

### C.        Responses to the Commission's Opinion Letter

The Commission's interpretation of the phthalate prohibitions received immediate criticism.  Four members of Congress who were instrumental in obtaining the passage of the phthalate prohibitions – Senator Boxer, Senator Feinstein, Representative Waxman and Representative Schakowsky – wrote to the Commission to express their belief that the Commission's interpretation was contrary to the clear intent of Congress, and to request that the Commission reverse its decision.  (Bernard Decl. Ex. E and Ex. F)  On December 2, 2008, Plaintiff National Resources Defense Council, Inc. formally petitioned the Commission to revoke the November 17 opinion letter.  (<u>Id.</u> Ex. H)  In addition, Plaintiffs commenced this action.  The Commission has not yet provided a substantive response to any of the requests to revoke its opinion letter.

## II.        APPLICABLE LEGAL STANDARDS

Under the Administrate Procedure Act, a district court may review "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

The Court must "hold unlawful and set aside" agency action that is ". . . not in accordance with law." 5 U.S.C. § 706(2)(A).[3]  Plaintiffs ask this Court to declare unlawful the Commission's interpretation of the phthalate prohibitions as not applying to existing inventory.  The Commission has cross-moved for summary judgment, asking the Court to hold that its interpretation is not contrary to the plain meaning of the statute, and that its opinion is reasonable and entitled to deference.

In deciding whether the Commission's decision is "not in accordance with" the CPSIA, the first question for the Court is "whether Congress has spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984).  Moreover, an agency decision interpreting a statute must be set aside if it conflicts with the plain meaning of the statute.  See Maislin Indus., U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 134-35 (1999) (an agency "does not have the power to adopt a policy that directly conflicts with its governing statute"); Chevron, 467 U.S. at 843 n.9 (courts "must reject administrative constructions which are contrary to clear congressional intent").

If Congress has not addressed the precise question at issue, or has done so in an ambiguous fashion, the Court must consider whether the Commission's interpretation of the CPSIA is entitled to deference.  When the interpretation at issue is contained in a rule promulgated under the agency's rulemaking authority, under Chevron,

_____

[3] The Commission does not contest Plaintiffs' entitlement to judicial review of its interpretation of the phthalate prohibitions under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 and 706(2)(A).

agency action must be upheld where "the agency's construction is reasonable." <u>Nat'l</u>

<u>Cable & Telecom. Ass'n v. Brand X Internet Serv.</u>, 545 U.S. 967, 980 (2005).  However,

agency interpretations set forth "in opinion letters," such as here, "do not warrant

<u>Chevron</u>-style deference."  <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000)

(contrasting interpretations in opinion letters with those "arrived at after . . . a formal

adjudication or notice-and-comment rulemaking").  Instead, "interpretations contained in

formats such as opinion letters are 'entitled to respect' under . . . <u>Skidmore v. Swift &</u>

<u>Co.</u>, 323 U.S. 134, 140 . . . (1944), but only to the extent that those interpretations have

the 'power to persuade,' <u>ibid.</u>"  <u>Christensen</u>, 529 U.S. at 587; <u>see also</u> <u>Catskill Devel.,</u>

<u>L.L.C. v. Park Place Enter. Corp.</u>, 547 F.3d 115, 127 (2d Cir. 2008) (under <u>Skidmore</u>,

agency position set forth in an opinion letter was "entitled to deference only to the extent

that it ha[d] the power to persuade" the court).

III.    **SECTION 108 UNAMBIGUOUSLY APPLIES**
        **TO ALL PRODUCTS OFFERED FOR SALE AFTER**
        **<u>FEBRUARY 10, 2009, INCLUDING EXISTING INVENTORY</u>**

            The Court must first consider whether Congress has directly spoken to the

question addressed by the Commission's opinion letter – namely, whether the phthalate

prohibitions apply to existing inventory.  In doing so, the Court "must look 'to the

particular statutory language at issue, as well as the language and design of the statute as

a whole, and, where appropriate, its legislative history.' . . . If these indicators

demonstrate that Congress has spoken to the question at issue, 'the [C]ourt, as well as the

agency, must give effect to the unambiguously expressed intent of Congress.'"  <u>Natural</u>

<u>Resources Defense Council v. Abraham</u>, 355 F.3d 179, 198-99 (2d Cir. 2004) (internal

citations omitted); <u>see also</u> <u>Cohen v. JP Morgan Chase & Co.</u>, 498 F.3d 111, 120 (2d Cir.

2007) (the court may "look to 'structure, purpose, and history' to determine whether

these construction devices can convincingly resolve . . . [a textual] ambiguity at <u>Chevron</u> step one. . . . A high level of clarity is necessary to resolve textual ambiguity in this manner.").

The Commission argues that the CPSIA is at least ambiguous with respect to the question at issue here, claiming that "section 108 is silent" as to "whether the phthalate provision is applicable to existing inventory." (Def. Br. at 16) As discussed below, however, the phthalate prohibitions – as written – are not "silent" on this question but instead unambiguously forbid the continued sale and distribution of products that violate the prohibitions, whether in inventory or otherwise.

A.    **The Plain Text of the Phthalate Prohibitions Bars**
       **the Sale of All Covered Products as of February 10, 2009**

Section 108 is entitled "Prohibition on sale of certain products containing specified phthalates." The phthalate prohibitions themselves are entitled "Prohibition on the sale of certain products containing phthalates" (Section 108(a)) and "Prohibition on the sale of additional products containing certain phthalates" (Section 108(b)(1)). Sections 108(a) and 108(b)(1) provide that "[b]eginning on the date that is 180 days after August 14, 2008 [<u>i.e.</u>, February 10, 2009] . . . it shall be unlawful for any person to . . . offer for sale . . . or distribute in commerce . . . any children's toy or child care article that contains" the prohibited phthalates. 15 U.S.C. §§ 2057c(a), (b)(1) (enacted as CPSIA §§ 108(a), (b)(1)). As the Second Circuit has observed, Congress's "use of the word 'any' in statutory text generally indicates Congress's intent to sweep broadly to reach <u>all</u> varieties of the item referenced." <u>Cohen</u>, 498 F.3d at 117 (emphasis added). The ordinary meaning of the words in the phthalate prohibitions is that beginning on February 10,

2009, it will be unlawful to sell or distribute <u>all</u> covered products containing the prohibited phthalates, regardless of when they were manufactured.

The Commission offers two arguments as to why the Court should not find that the plain meaning of the phthalate prohibitions is to prohibit the sale of all covered products as of February 10, 2009. First, the Commission argues that Congress's decision to designate the phthalate provisions as "prohibitions" rather than "bans" was intended to signal that the sale of existing inventory is permitted. (Def. Br. at 16-17) While Congress did not choose to ban phthalates under the FHSA, this does not alter the fact that the plain language of Sections 108(a) and 108(b)(1) prohibits the sale and distribution of all covered products as of February 10, 2009, and that Sections 108(a) and 108(b)(1) contain no inventory exception.

Second, the Commission argues that the words "it shall be unlawful . . . to offer for sale . . . [or] distribute in commerce" do not mean what they say on their face because they "simply mirror[] the 'prohibited acts' language that is already contained in the CPSA, 15 U.S.C. § 2068(a). . . ." (Def. Br. at 18) The gist of the Commission's argument is that because Section 2068(a) prohibits "offer[ing] for sale" and "distribut[ing] in commerce," yet does not ordinarily bar the sale of existing inventory, the words "it shall be unlawful to . . . offer for sale . . . [or] distribute in commerce" in the phthalate prohibitions should not be interpreted as barring the sale of existing inventory. (<u>Id.</u>)

The Commission's argument misses the point. The words "it shall be unlawful to . . . offer for sale . . . [or] distribute in commerce," as used in Section 2068(a), apply on their face to existing inventory. The only reason that Section 2068(a) does not

ordinarily have the effect of barring the sale of existing inventory is that it prohibits the "offer for sale" or "distribut[ion] in commerce" of "<u>any consumer product . . . that is not in conformity with an applicable consumer product safety rule</u>."  15 U.S.C. § 2068(a) (emphasis added).  And Congress has separately provided that certain "consumer product safety rules" – <u>i.e.</u>, those rules that take the form of a consumer product safety standard promulgated by the Commission – "shall be applicable only to consumer products manufactured after the effective date" of the safety standard.  15 U.S.C. § 2058(g)(1); <u>see also</u> 15 U.S.C. § 2052(a)(6) (defining "consumer product safety rule" to include consumer product safety standards promulgated under Section 2056(a)).  Thus, nothing in Section 2068(a) suggests that the words "it shall be unlawful to . . . offer for sale . . . [or] distribute in commerce" should be given anything other than their ordinary meaning in the phthalate prohibitions.

    The plain text of the phthalate prohibitions provides unequivocally and unambiguously that no covered products may be sold as of February 10, 2009.  Unless another section of the statute can be read as creating an express exception for existing inventory, the Commission may not interpret the phthalate prohibitions as containing such an exception.

    **B.    The Statutory Context Is Consistent With<br>the Plain Language of the Phthalate Prohibitions**

    The Commission argues that Congress <u>did</u> expressly create an exception for existing inventory by providing – in Section 108(d), a different provision of the CPSIA (15 U.S.C. § 2057c(d)) – that the phthalate prohibitions "shall be considered consumer product safety standards under the [CPSA]."  As noted above, in Section 2058(g)(1), the CPSA provides that "[a] consumer product safety standard shall be

applicable only to consumer products manufactured after the effective date." 15 U.S.C. § 2058(g)(1). In determining whether the phthalate prohibitions unambiguously apply to existing inventory, the Court must consider these provisions and indeed all of the context provided by the CPSIA and the CPSA as a whole:

> In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning – or ambiguity – of certain words or phrases may only become evident when placed in context. . . . It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) (internal citations omitted); see also Auburn Housing Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002) ("The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute.").

When considered in the context of the entire CPSIA and CPSA, it is clear that Section 108(d) does not, and was not intended to, create an exception for existing inventory.

## 1. The Section 2058(g)(1) Inventory Exception Does Not Apply Automatically to the Phthalate Prohibitions

The Commission argues that the plain language of Section 108(d) – providing that the phthalate prohibitions "shall be considered consumer product safety standards" – makes the inventory exception in 15 U.S.C. § 2058(g)(1) applicable to the phthalate prohibitions. (Def. Br. at 14, 17-18 & n.2) Put differently, the Commission argues that although Congress did not expressly state that the Section 2058(g)(1)

inventory exception applies to the phthalate prohibitions, that result is the necessary consequence of Congress having stated in Section 108(d) that the prohibitions "shall be considered consumer product safety standards." However, the language and structure of the CPSA and CPSIA support the opposite conclusion.

**a.** **On Its Face, the Inventory Exception**
**Applies to Consumer Product Safety Standards**
**<u>Promulgated By the Commission</u>**

In arguing that the Section 2058(g)(1) inventory exception applies to the phthalate prohibitions, the Commission plucks one sentence out of a multi-page statute, analyzes that sentence in isolation, and fails to address the context provided by the rest of Section 2058. This context strongly suggests that the inventory exception applies as a matter of course only to consumer product safety standards promulgated by the Commission.

Section 2058 is entitled "Procedure for consumer product safety rules," and it establishes procedures for the Commission's exercise of its own power to promulgate consumer product safety rules, including consumer product safety standards under 15 U.S.C. § 2056. Each subsection of Section 2058 expressly establishes rules that <u>the Commission</u> must follow in promulgating, amending or revoking a consumer product safety rule. <u>See, e.g.</u>, 15 U.S.C. § 2058(a) (establishing procedure for Commission to commence rulemaking); <u>id.</u> § 2058(b) (establishing rules for Commission's adoption of voluntary product safety standards); <u>id.</u> § 2058(c) (requiring Commission to provide certain analysis when proposing a rule); <u>id.</u> § 2058(d) (requiring Commission to act on proposed rules within a certain time frame); <u>id.</u> § 2058(e) (requiring Commission to consider certain information in promulgating rules); <u>id.</u> § 2058(f) (setting forth additional requirements for Commission to fulfill before promulgating a rule); <u>id.</u> § 2058(g) (setting

requirements with respect to effective dates of rules promulgated by Commission, and

allowing Commission to prohibit stockpiling); id. § 2058(h) (establishing when

Commission may amend or revoke a consumer product safety rule); id. § 2058(i)

(establishing requirements for Commission with respect to responding to petitions to

initiate rulemaking).

Subsection 2058(g)(1) is no exception. It establishes parameters that the

Commission must stay within when setting the effective date of a new consumer product

safety standard:

> Each consumer product safety rule shall specify the date such rule is to
> take effect not exceeding 180 days from the date promulgated, unless the
> Commission finds, for good cause shown, that a later effective date is in
> the public interest and publishes its reasons for such finding. The
> effective date of a consumer product safety standard under this chapter
> shall be set at a date at least 30 days after the date of promulgation unless
> the Commission for good cause shown determines that an earlier effective
> date is in the public interest. In no case may the effective date be set at a
> date which is earlier than the date of promulgation. A consumer product
> safety standard shall be applicable only to consumer products
> manufactured after the effective date. (15 U.S.C. § 2058(g)(1)).

Nothing in the structure or text of Section 2058 suggests that any part of

that provision, which relates entirely to the Commission's powers, would automatically

apply to a consumer product safety standard that was enacted by Congress and not

promulgated by the Commission.[4] See Gutierrez v. Ada, 528 U.S. 250, 254-55 (2000)

---

[4] Accepting the Commission's argument that the provisions of Section 2058 apply
indiscriminately to consumer product safety standards or rules enacted by Congress
would lead to absurd results. For example, Section 2058(h) provides that "[t]he
Commission may by rule amend or revoke any consumer product safety rule." Given
that the definition of "consumer product safety rule" includes consumer product safety
standards, see 15 U.S.C. § 2052(a)(6), if the Commission's interpretation were accepted,
the Commission would have the power to revoke the phthalate prohibitions because they
were designated consumer product safety standards by Congress. This is obviously
absurd, as the Commission conceded at argument (Tr. 26:16-20 (agreeing that parts of

(holding that the phrase "in any election" plainly meant "in any election for Governor and Lieutenant Governor" because it was in a statutory provision that otherwise solely – and repeatedly – addressed gubernatorial elections).  It would be particularly incongruous to apply Section 2058(g)(1) to the phthalate prohibitions, given that that provision relates entirely to <u>the Commission's</u> power to set effective dates, whereas here Congress explicitly specified in Section 108 the date the phthalate prohibitions are to take effect.

**b.**     **The Plain Language of the CPSA and CPSIA
Precludes Finding that Section 2058(g)(1)
<u>Applies to the Phthalate Prohibitions</u>**

The Commission argues that, regardless of context, the plain language of Section 2058(g)(1) indicates that a "consumer product safety standard" cannot prohibit distribution of products manufactured before the standard's effective date (Def. Br. at 18; Def. Reply Br. at 5), and that when Congress chose to provide that the phthalate prohibitions "shall be considered consumer product safety standards" it thereby intended to make the inventory exception applicable to these new prohibitions.  The Commission further argues that Plaintiffs' interpretation cannot be correct because it has the effect of giving the words "consumer product safety standard" one meaning when applied to a provision promulgated by the Commission, and a different meaning when applied to a Congressionally-enacted safety standard such as the phthalate prohibitions.  While it is true that a "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning," <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 570 (1995) (internal quotations omitted), the issue here is not whether

---

Section 2058 are "obviously inapplicable" to the phthalate prohibitions)), and illustrates the inherent danger in plucking excerpts from Section 2058 and applying them to rules or standards enacted by Congress.

the term "consumer product safety standard" always has the same meaning. Rather, the issue is whether Congress's use of the term "consumer product safety standard" was intended to make the inventory exception of Section 2058(g)(1) applicable to the phthalate prohibitions. The plain language of the CPSA and CPSIA does not support the Commission's argument that this was Congress's intent.

"Consumer product safety standard" is not a defined term in the CPSA. Section 2056 of the Act, however, provides that the "Commission may promulgate consumer product safety standards in accordance with the provisions of section 2058 of this title," and Section 2056(a) further provides:

> A consumer product safety standard <u>shall consist of</u> one or more of any of the following types of <u>requirements</u>:
>
> (1) Requirements expressed in terms of performance requirements.
>
> (2) Requirements that a consumer product be marked with or accompanied by clear and adequate warnings or instructions, or requirements respecting the form of warnings or instructions. (15 U.S.C. § 2056(a) (emphasis added)

The CPSA provides that the consumer product safety standards described above – <u>i.e.</u>, those promulgated by the Commission under Section 2056(a) – constitute one type of "consumer product safety rule." 15 U.S.C. § 2052(a)(6). The other type of "consumer product safety rule" is "a rule under this chapter declaring a consumer product a banned hazardous product." <u>Id.</u> Thus, under the CPSA, a "consumer product safety standard" adopted by the Commission is a provision that, among other things: (1) consists solely of a performance or labeling requirement; (2) is different from a rule declaring a consumer product to be a "banned hazardous product"; and (3) pursuant to Section 2058(g)(1) is not applicable to products "manufactured before the effective date."

Although Section 108(d) states that the phthalate prohibitions "shall be considered consumer product safety standards," these prohibitions fall outside Section 2056(a)'s description of a Commission-promulgated "consumer product safety standard" because they do more than establish a performance or labeling requirement – they also make certain conduct unlawful, and they contain their own effective date provision.  <u>See</u> 15 U.S.C. §§ 2057c(a), (b)(1).  Any rule promulgated under Section 108(b)(3)(B) would likewise fall outside Section 2056(a)'s description of a Commission-promulgated "consumer product safety standard," because Section 108(b)(3)(B) relates solely to a rule declaring a product to be a "banned hazardous product" – a category distinct from a consumer product safety standard.[5]  <u>See</u> 15 U.S.C. § 2057c(b)(3)(B).  Moreover, with respect to rules promulgated under Section 108(b)(3), Congress expressly instructed the Commission to follow the less rigorous rulemaking procedures set forth in 5 U.S.C. § 553 rather than the procedures for Commission-promulgated consumer product safety standards set forth in Section 2058.  <u>See</u> 15 U.S.C. § 2057c(b)(3).

The phthalate prohibitions enacted by Congress do not fit within the statutory description of Commission-promulgated "consumer product safety standards." Accordingly, Congress's direction that these prohibitions "shall be considered consumer product safety standards" in Section 108(d) does not automatically make the inventory

---

[5]  Section 2057 authorizes the Commission to declare a product a "banned hazardous product" when the product "presents an unreasonable risk of injury" and "no feasible consumer product safety standard under this chapter would adequately protect the public."  15 U.S.C. § 2057.

exception – one aspect of Commission-promulgated safety standards – applicable to those prohibitions.[6]

> ### 2. The Language and Structure of the CPSIA Show that Congress Did Not Intend Section 2058(g)(1) to Apply to the Phthalate Prohibitions

Several other aspects of the structure and language of the CPSIA show that Congress did not intend to make the inventory exception applicable to the phthalate prohibitions when it enacted Section 108(d).

First, in determining the meaning of statutory language, the Court "must consider . . . its placement and purpose in the statutory scheme." United States v. Dauray, 215 F.3d 257, 261 (2d Cir. 2000) (internal quotations omitted). Congress placed the keys words at issue here – "shall be considered consumer product safety standards" – in a subsection explicitly associated with pre-emption. Indeed, Section 108(d) is entitled "Treatment as Consumer Product Safety Standards; Effect on State Law."[7] Its text consists of just two sentences: the sentence stating that the phthalate prohibitions "shall

---

[6] In support of its argument that the inventory exception necessarily applies to anything that Congress directs "shall be considered a consumer product safety standard," the Commission notes that on several occasions, Congress has expressly stated that Section 2058 would not apply to a safety standard or rule. (Def. Br. 18 n.2) However, in each of these instances, Congress provided that the rule in question "shall be considered to be a consumer product safety rule issued by the Consumer Product Safety Commission." See 15 U.S.C. § 2056 note (citing Pub. L. 110-278 and Pub. L. 101-608) (emphasis added) (relating to child-resistant portable gasoline containers and automatic garage door openers); see also 15 U.S.C. § 6004(a)-(c) (directing the Commission to issue a consumer product safety standard concerning children's bicycle helmets). Thus, Congress's explicit statement that Section 2058 would not apply in these cases merely confirms its understanding that the Commission is ordinarily bound to comply with Section 2058.

[7] While the plain meaning of a statutory provision is not controlled by its title, "a title may be a useful 'tool for the resolution of a doubt about the meaning of a statute.'" Collazos v. United States, 368 F.3d 190, 196 (2d Cir. 2004) (internal citations and modifications to quotation omitted).

be considered consumer product safety standards," and a sentence providing that "[n]othing in this section or the Consumer Product Safety Act (15 U.S.C. 2051 et seq.) shall be construed to preempt or otherwise affect any State requirement with respect to any phthalate alternative not specifically regulated" under the CPSA.  Moreover, designating a provision as a "consumer product safety standard" has important pre-emption ramifications under the CPSA.

Section 2075 of the CPSA provides that "[w]henever a consumer product safety standard under this chapter is in effect and applies to a risk of injury associated with a consumer product, no State . . . shall have any authority to either establish or to continue in effect any provision of a safety standard or regulation [concerning] . . . such product . . . [unless the State standard] provides a significantly higher degree of protection from such risk of injury than the consumer product safety standard under this chapter."  15 U.S.C. § 2075(a) and (c)(1) (emphasis added).[8]  Designating the phthalate prohibitions as consumer product safety standards brings them within a well established statutory pre-emption scheme and makes clear that states can preserve their more expansive phthalate regulations pertaining to non-covered products.  The second sentence of Section 108(d) clarifies that the phthalate prohibitions have no pre-emptive effect with respect to phthalate alternatives that have not expressly been addressed by Congress or the Commission.[9]  Accordingly, Congress's decision to use the words "shall be

---

[8] In addition, states must apply to the Commission for permission to establish or continue such a standard and must show that the standard will not unduly burden interstate commerce.  15 U.S.C. § 2075(c).  The CPSA pre-emption provision further provides that states may establish standards providing a higher degree of protection with respect to products that are for the state's own use.  Id. § 2075(b).

[9] The legislative history shows that Congress was aware that several states have regulated phthalates in children's products, and wanted to avoid pre-empting regulations that apply

considered consumer product safety standards" in Section 108(d) shows a concern about pre-emption, not an intention to create an exception for inventory.

Second, in Section 108(d), Congress did not state that the phthalate prohibitions should be treated "as if issued by the Commission under Section 2058." Congress did, however, make such an express statement with respect to the new toy safety standards that it adopted in Section 106 of the CPSIA. Compare 15 U.S.C. § 2057c(d) (CPSIA Section 108(d), stating that the phthalate prohibitions "shall be considered consumer product safety standards under the Consumer Product Safety Act") with id. §§ 2056b(a), (f) (enacted as CPSIA Sections 106(a) and 106(f), stating that the new toy safety standards "shall be considered consumer product safety standards issued by the Commission under section 2058 of this title" (emphasis added)).

The Court must presume that this difference between Section 108(d) and Sections 106(a) and 106(f) is meaningful, and that Congress intentionally chose not to state that the phthalate prohibitions should be treated "as if issued by the Commission under Section 2058." The import of this choice is that Congress did not intend for Section 2058 to apply to the phthalate prohibitions. See Rabin v. Wilson-Coker, 362 F.3d 190, 196 (2d Cir. 2004) ("If drafters choose to use one word in part of a statute and omit it in another, 'it is generally presumed that Congress acts intentionally and

---

to a broader range of children's products than the federal phthalate prohibitions. 154 Cong. Rec. H7577-01, 2008 WL 2917275 (July 30, 2008 statement of Rep. Waxman) ("I am . . . pleased that under another key provision of the [CPSIA] – the new prohibition on phthalates – states retain the ability to regulate phthalates in product classes that are not regulated under this legislation."). The legislative history further shows that Congress was also aware that California regulates phthalate alternatives (which are not covered by the CPSIA) and did not want to pre-empt those regulations. See id. ("California has a law on phthalate alternatives and it is important that that law will remain in effect as the new Federal ban on phthalates enters into force.").

purposely in the disparate inclusion or exclusion.'" (quoting <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983))); <u>Friends of Gateway v. Slater</u>, 257 F.3d 74, 81 (2d Cir. 2001) (comparing provisions of concurrently enacted legislation and finding that presence of restrictions in one act, and absence of restrictions in other act, "demonstrates . . . [that] Congress knew how to implement such restrictions if it so desired").

In sum, Section 108's text and structure provide two affirmative reasons to conclude that Congress did not intend for the inventory exception provision of Section 2058(g)(1) to apply to the phthalate prohibitions. In contrast, the Commission has not identified any aspect of Section 108's structure that supports the opposite conclusion. The Commission's sole argument in this regard is that Congress, in the CPSIA, expressly addressed existing inventory only in Section 104(c), which deals with cribs, and that its failure to do the same in Section 108 indicates that it did not intend the phthalate prohibitions to apply to existing inventory. (Def. Br. at 12, 19) Section 104(c), however, contains no discussion of "inventory." Instead, this provision makes it unlawful to "manufacture, sell, contract to sell or resell, lease, sublet, offer, provide for use or otherwise place in the stream of commerce a crib that is not in compliance with" an applicable consumer product safety standard. 15 U.S.C. § 2056a(c)(1).

The Commission argues that the words "place in the stream of commerce" "make clear that . . . [the new crib standards] appl[y] to inventory." (Def. Br. at 19) The Commission does not explain, however, why it is clear that the words "place in the stream of commerce" apply to inventory, while a very similar phrase – "distribute in commerce" (used in the phthalate prohibitions) – obviously does not. Moreover, the legislative history of Section 104(c) reveals that the Commission's assertion is entirely

unfounded, because that section was designed to address second-hand cribs – not unsold, new inventory.  See 154 Cong. Rec. S7867-01, 2008 WL 2938243 (July 31, 2008 statement of Sen. Feinstein) (describing CPSIA as "clos[ing] a loophole in consumer product safety standards" by "prohibit[ing] commercial users, such as thrift stores and resale furniture stores, . . . [from] sell[ing], resell[ing] or leas[ing] unsafe used cribs . . .[;] prohibit[ing] hotels, motels, and day-care centers from using unsafe cribs, and add[ing] secondhand cribs to the list of child and infant products covered by the Consumer Product Safety Act").

> ### 3. Congress's Decision Not To Declare Phthalates a "Banned Hazardous Substance" or To Declare the Covered Products To Be "Banned Hazardous Products" Does Not Undermine the <u>Plain Meaning of the Phthalate Prohibitions</u>

The Commission's final argument relating to the language and context of the CPSIA as a whole is that "Congress[] cho[se] not to call the phthalate prohibition a ban"[10] or to "designate the phthalate containing products as banned hazardous products . . . or banned hazardous substances," and that that choice has significance with respect to whether the inventory exception applies to the phthalate prohibitions.  (Def. Br. at 16-17;

_____

[10]  The Court discusses in the text of this opinion the statutory significance of Congress's decision not to treat phthalates as banned hazardous substances.  As a matter of standard English usage, however, the Court does not agree with the Commission's argument that Congress's use of the word "prohibition" in Section 108 indicates a decision to treat differently inventory of products containing phthalates from the inventory of products contained "banned" substances.  "Prohibition" and "ban" have the same meaning in everyday use.  See, e.g., Webster's Third New International Dictionary 169 (2002) (defining "ban" as "to prohibit esp[ecially] by legal means . . .").  Indeed, these terms are used interchangeably by the Commission itself, as shown by the General Counsel's use of the word "ban" to describe the phthalate prohibitions in an opinion letter issued shortly after the opinion at issue here.  See November 25, 2008 Letter from Commission General Counsel Cheryl A. Falvey to Kevin M. Burke at 1 ("Section 108 permanently bans three specific types of phthalates and bans a different group of another three phthalates on an interim basis."), available at http://www.cpsc.gov/library/foia/advisory/321.pdf (last visited on February 5, 2009).

Def. Reply Br. at 2-3)  The Commission's argument is based on the fact that the

inventory exception of Section 2058(g)(1) applies only to "consumer product safety

standards" and not to banned hazardous products or substances.  15 U.S.C. § 2058(g)(1).

Thus, the Commission reasons, if Congress had declared the covered products to be

"banned hazardous products" or "banned hazardous substances" under the CPSA, there

would be no possible argument that the inventory exception applies to the phthalate

prohibitions.  (Id.)  From this alleged fact, the Commission would have this Court infer

that Congress intended the inventory exception to apply to the phthalate prohibitions.

        The Commission's argument is unpersuasive because it depends on

multiple false premises.  This Court cannot infer what Congress's intent was as to

inventory from Congress's decision not to designate the covered products as banned

hazardous products or as products containing banned hazardous substances.

        As an initial matter, it is not the case that the sale of inventory is

invariably prohibited for banned hazardous products and products containing banned

hazardous substances.  The Commission has in the past permitted the sale of inventory

even in cases where a product has been declared a banned hazardous product or contains

a banned hazardous substance.  (See Bernard Decl. Ex. J at 3 (September 12, 2008

memorandum from Commission's General Counsel to its Acting Chairman, observing

that "[i]n the past, when the agency has determined that a product shall be treated as a

banned hazardous substance, it has sometimes applied the ban retroactively to inventory

and sometimes it has not").)  Moreover, although Congress chose not to regulate

phthalates under the statutory schemes for "banned hazardous substances" or, at this time,

for "banned hazardous products," that choice cannot support any inference about

Congress's intent with respect to existing inventory. There are numerous differences between the statutory provisions that apply to banned hazardous substances and those that apply to banned hazardous products and products covered by consumer product safety standards.[11] The inapplicability of Section 2058(g)(1) to banned hazardous substances and banned hazardous products is just one of those differences, and there is no evidence from which this Court can infer that Congress chose not to designate phthalates as "banned hazardous substances" or phthalate-containing products as "banned hazardous products" because of that particular difference between the statutory schemes.

Finally, and contrary to the Commission's assertion, Congress did not make a clear decision that phthalate-containing products would not be banned as "banned hazardous products." Instead, Congress prohibited the manufacture, sale, and importation of covered products containing certain amounts of six specific phthalates beginning on February 10, 2009, and further instructed the Commission to commence the process of studying "the effects on children's health of all phthalates and all phthalate alternatives as used in children's toys and child care articles." 15 U.S.C. § 2057c(b)(2)(A) (emphasis added) (codifying CPSIA Section 108(b)(2)(A)). Congress further directed that within 180 days after receiving the results of this study, the Commission "shall . . . declare any children's product containing any phthalates to be a

_____

[11] Banned hazardous substances are covered by a different statute, the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261 et seq. (the "FHSA"). If phthalates had been designated banned hazardous substances, a different range of conduct would have been prohibited with respect to phthalates, see 15 U.S.C. § 1263, and the penalties for engaging in prohibited conduct would be somewhat different. Compare 15 U.S.C. § 1264-68 (penalty and enforcement scheme under FHSA) with 15 U.S.C. §§ 2069-70 (setting forth civil and criminal penalties under the CPSA). Further, the CPSA has a provision for private enforcement through citizen suits, whereas the FHSA does not. See 15 U.S.C. § 2073.

banned hazardous product under section 8 of the Consumer Product Safety Act (15 U.S.C. 2057), as the Commission determines necessary to protect the health of children." 15 U.S.C. § 2057c(b)(3)(B) (emphasis added) (codifying CPSIA Section 108(b)(3)(B)).

Thus, in enacting Section 108, Congress clearly contemplated that a "banned hazardous product" designation for covered products containing phthalates might in fact be appropriate, and it directed the Commission to consider that option. Moreover, Congress chose to codify Section 108 in Section 2057 of the CPSA – the section that relates to banned hazardous products – rather than in Section 2056, which relates to consumer product safety standards. Compare 15 U.S.C. § 2057 (entitled "Banned hazardous products"), § 2057a (designating butyl nitrate a "banned hazardous product"), § 2057b (designating volatile alkyl nitrate a "banned hazardous product") and § 2057c (the phthalate prohibitions, enacted as Section 108 of the CPSIA) with 15 U.S.C. § 2056 (entitled "Consumer product safety standards"), § 2056a (entitled "Standards and consumer registration of durable nursery products," enacted as Section 104 of the CPSIA) and § 2056b (entitled "Mandatory toy safety standards," enacted as Section 106 of the CPSIA). See also Dauray, 215 F.3d at 261 (in determining plain meaning of statutory language, court should consider its "placement . . . in the statutory scheme").

In sum, nothing in Congress's use of the word "prohibition," or its failure to use the word "ban," supports an inference that Congress intended to exempt existing inventory from the phthalate prohibitions.

\*     \*     \*

The plain language of the phthalate prohibitions makes it unlawful to sell "any" covered product beginning on February 10, 2009. 15 U.S.C. §§ 2057c(a), (b)(1).

The "particular statutory language at issue, as well as the language and design of the statute as a whole," <u>Abraham</u>, 355 F.3d at 198-99, all support the conclusion that Congress did not intend to exempt existing inventory from the phthalate prohibitions. Therefore, the Court finds that "Congress has spoken to the question at issue," <u>id.</u>, and has unambiguously prohibited the sale of covered products, including existing inventory, beginning on February 10, 2009.

        C.        **<u>Statutory Purpose and Legislative History</u>**

        Although the language and structure of the statutes are dispositive here, the CPSA's purpose and the CPSIA's legislative history also support a finding that the phthalate prohibitions unambiguously apply to existing inventory. <u>See</u> <u>Cohen</u>, 498 F.3d at 120 (courts may look to "structure, purpose, and history" in determining whether Congress has directly spoken to an issue).

        That interpretation of the phthalate prohibitions is clearly most consistent with the purposes of the CPSA. One of the CPSA's purposes is "protect[ing] the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. § 2051(b)(1). Assuming that phthalates give rise to an unreasonable risk of injury, consumers would be best protected by making the covered products completely unavailable beginning on February 10, 2009, rather than allowing retailers to continue to sell those products for an unlimited amount of time until they exhaust their existing inventory.[12] Further, allowing retailers to sell existing inventory would not serve a

---

[12]  The Commission conceded at oral argument that the amount of inventory of covered products is "huge." (Tr. 36:14-19) The Commission also stated at oral argument that, under its interpretation of Section 108, covered products manufactured at any time prior to February 10, 2009 – including during the six-month period between enactment and the effective date of February 10, 2009 – could be sold indefinitely. (Tr. 35:22-25) While the six month lag time provided for under the statute was presumably intended to give

second purpose of the CPSA, which is to "assist consumers in evaluating the comparative safety of consumer products." 15 U.S.C. § 2051(b)(2). As the Commission conceded at oral argument (Tr. 36:20-25), if retailers are allowed to continue to sell existing inventory, consumers will have no way to distinguish which products comply with the phthalate prohibitions and which do not.

The legislative history is less informative than the statutory purpose, because it does not expressly address the scope of the phthalate prohibitions. However, it does provide further refutation of the Commission's contention that the CPSIA represents a choice by Congress <u>not</u> to ban phthalates. The legislative history shows that members of Congress made no distinction between the effect of the phthalate prohibitions and the effect of the provision designating certain products containing lead as "banned hazardous substances." <u>See</u> 15 U.S.C. § 1278a(a)(1) (enacted as CPSIA Section 101(a)(1)). To the contrary, members of Congress repeatedly referred to the lead and phthalate provisions together, and called them both "bans." <u>See, e.g.</u>, 154 Cong. Reg. E1670-04, 2008 WL 2945220 (July 30, 2008 statement of Rep. Conyers) (CPSIA "ban[s] lead and 6 toxins categorized as 'phthalates' in children's toys"); 154 Cong. Rec. S7867-01, 2008 WL 2938243 (July 31, 2008 statement of Sen. Inouye) (CPSIA "bans . . . lead and certain phthalates from children's products"); <u>id.</u> (July 31, 2008 statement of Sen. Boxer) (CPSIA "includes a strong ban on lead and phthalates"); 154 Cong. Rec. H7577-01, 2008

---

industry time to dispose of non-compliant inventory and retool for compliant products, under the Commission's interpretation, companies would have little incentive to reduce production of non-compliant products in the six months preceding Section 108's effective date. Further, under the Commission's interpretation, Congress's decision to give companies precisely 180 days to come into compliance with the phthalate prohibitions would be rendered meaningless, because companies could continue selling non-compliant products indefinitely, as long as they were manufactured before February 10, 2009.

WL 2917275 (July 30, 2008 statement of Rep. Dingell) (under the CPSIA, "[t]he presence of lead and dangerous phthalates in toys and other products of children up to age 12 will be banned"); id. (July 30, 2008 statement of Rep. Rush) (CPSIA "effectively bans lead and certain phthalates in children's products"); id. (July 30, 2008 statement of Rep. Schakowsky) ("For the first time, we are virtually banning lead in children's products as well as the harmful phthalates that can cause hormonal damage."); id. (July 30, 2008 statement of Rep. Markey) ("We have agreed to ban lead and p[h]thalates in children's products.").[13]

Because the Commission's interpretation of the phthalate prohibitions is contrary to the language and structure of the CPSIA, and is inconsistent with the CPSA's purpose and the CPSIA's legislative history, it must be set aside as "not in accordance with law." 5 U.S.C. § 706(2)(A).

## IV. THE COMMISSION'S INTERPRETATION OF SECTION 108 IS NOT ENTITLED TO DEFERENCE

Even if the phthalate prohibitions could be construed as ambiguous with respect to their application to existing inventory, the Commission's opinion letter would not be entitled to deference because it is not thorough, well-reasoned or substantiated. Moreover, while the Commission argues that the Court should defer to its opinion in

---

[13] See also 154 Cong. Rec. E1645-01, 2008 WL 2945141 (July 30, 2008 statement of Rep. DeLauro) (CPSIA "include[s] a ban on toxic phthalates from children's products"); 154 Cong. Rec. E1663-03, 2008 WL 2945195 (July 30, 2008 statement of Rep. McCollum) (CPSIA "ban[s] toxic phthalates in children's toys"); 154 Cong. Rec. S7867-01, 2008 WL 2938243 (July 31, 2008 statement of Sen. Feinstein) (CPSIA "bans the use of six phthalates in many children's products and child care articles"); 154 Cong. Rec. H7577-01, 2008 WL 2917275 (July 30, 2008 statement of Rep. Waxman) (CPSIA includes "a ban on phthalates"); id. (July 30, 2008 statement of Rep. Pelosi) (CPSIA "bans toxic phthalates in children's toys and child care articles"); id. (July 30, 2008 statement of Rep. DeGette) (CPSIA "permanently bans three phthalates and temporarily bans three others in toys for kids 12 and under").

order to avoid giving retroactive effect to the phthalate prohibitions, this case – as the Commission conceded at oral argument (Tr. 33:23-24) – does not implicate true retroactivity concerns.

### A.     The Opinion Letter Is Not Entitled to Deference

Under Skidmore v. Swift & Co., 323 U.S. 134 (1944), "the weight . . . [the court] accord[s] an agency interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" Boykin v. KeyCorp, 521 F.3d 202, 208 (2d Cir. 2008) (quoting Skidmore, 323 U.S. at 140).  The "'validity' inquiry looks to whether an agency interpretation is well-reasoned, substantiated, and logical." Id. (internal quotation omitted).  The Commission's opinion letter does not demonstrate the thoroughness of consideration and validity of reasoning that would warrant deference under Skidmore.

As an initial matter, the Court notes that the opinion letter was prompted by a request for guidance dated just two business days earlier.  (Bernard Decl. Ex. A) Any agency would be hard-pressed to issue a fully considered opinion in the brief amount of time it took the Commission's General Counsel to issue the opinion letter here.

More importantly, the opinion letter does not reveal any thorough consideration or analysis of the plain language of the phthalate prohibitions or the context provided by the CPSIA and CPSA as a whole.  "Statutory construction is a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as . . . structure . . . and subject matter." U.S. Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) (internal quotation omitted).  The opinion

letter here does not even mention the plain language of the phthalate prohibitions, which state that "[b]eginning on" February 10, 2009, it will be unlawful to "offer for sale" or "distribute in commerce . . . any" covered products.  15 U.S.C. § 2057c(a), (b)(1) (emphasis added).  Instead of grappling with what appears to be direct and unequivocal prohibitions, the opinion letter relies entirely on the language of 15 U.S.C. § 2058(g)(1), which it considers in isolation, without regard to the context provided by Section 2058 as a whole.  In particular, the opinion letter does not address the fact that Section 2058's numerous provisions expressly refer to limitations on the Commission, not to restrictions on Congressional legislation.  The opinion letter also does not discuss the language or context of Section 108(d), which is the only section that could arguably make Section 2058(g)(1) applicable to the phthalate prohibitions.  Nor does it address any of the aspects of Section 108 that affirmatively indicate that Congress did not intend for Section 2058(g)(1)'s inventory exception to apply to the phthalate prohibitions.  Instead, the opinion letter simply assumes that Section 2058(g)(1) automatically applies to the phthalate prohibitions.

The opinion letter notes that Section 108 "appears to reflect a desire to keep the fundamental expectations of the regulatory process consistent with past practice under the existing statute."  (Bernard Decl. Ex. B at 2)  However, this assertion is not supported by any citation whatsoever, whether to the statute's language or purpose, its legislative history, case law, agency guidance, or any other source.  Strikingly, the opinion letter ignores an obvious alternative explanation for Section 108(d) – i.e., that Congress wished to make a specific pre-emption regime applicable to phthalates.  And as demonstrated above, there is nothing in the statute's structure, purpose or legislative

history that affirmatively suggests that Congress intended for the inventory exception to apply to the phthalate prohibitions.  (See supra Section III).

        The opinion letter offers two additional reasons for finding that the phthalate prohibitions, unlike the lead prohibitions, do not apply to existing inventory.  First, it notes that Congress regulated lead under a different statutory scheme, namely, the Federal Hazardous Substances Act.  However, as explained above (supra pp. 23-26), this fact does not logically support the conclusion that Congress did not intend the phthalate prohibitions to apply to existing inventory.  Further, the Commission's reasoning ignores the legislative history, which shows that members of Congress viewed the lead and phthalate provisions as having the same effect of "banning" covered products.  (See supra pp. 28-29 & n.13).

        Second, the opinion letter states that Congress did not make a "clear statement of unambiguous intent to apply [the phthalate prohibitions] retroactively."  (Id.) It further states that in the absence of evidence of such an intent, the Commission will not presume that the phthalate prohibitions apply to existing inventory, in accordance with Landgraf v. USI Film Products, 511 U.S. 244 (1994).  The General Counsel opines that the interests that warrant avoiding giving retroactive effect to a statute under Landgraf "are clearly implicated here because the property at issue, products in inventory in the distribution chain, was manufactured prior to any indication from Congress or the Commission that the level of phthalates in those products would be restricted."  (Bernard Decl. Ex. B at 2)  As discussed below, this assertion is not supported by the facts or the law.  (See infra pp. 33-36).

Given that the November 17, 2008 opinion letter fails to consider the vast majority of the relevant language of the statute and all of the relevant statutory context, is not well reasoned, and reaches a result that undermines the purpose of the CPSA and the CPSIA, it is not entitled to deference under Skidmore.  See, e.g., Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 129 (2d Cir. 2008) (agency opinion not entitled to deference under Skidmore where it failed to account for statute's language); Fed. Election Comm'n v. Political Contributions Data, Inc., 943 F.2d 190, 196 (2d Cir. 1991) (finding advisory opinion unreasonable in part because it was inconsistent with the statute's purpose).  Cf. In re New Times Sec. Serv., Inc., 371 F.3d 68, 83-85 (2d Cir. 2004) (finding agency interpretation persuasive under Skidmore because it furthered the statute's goals and was supported by the legislative history).

**B.** **The Commission's Retroactivity Arguments Are Not Well Founded and Do Not Warrant Deferring to the Commission's Opinion**

The Commission's opinion letter, and the Commission's briefs here, assert that applying the phthalate prohibitions to inventory existing as of February 10, 2009, would implicate retroactivity concerns.  (See Def. Br. at 24-25)  When retroactivity concerns are raised, the first question for the Court is "whether Congress 'has expressly prescribed the statute's proper reach' – i.e., whether Congress clearly intended a retroactive application.  . . . If Congress has spoken clearly, 'the inquiry is over and the court must implement Congress's intent . . . .'"  Guaylupo-Moya v. Gonzales, 423 F.3d 121, 129-30 (2d Cir. 2005) (internal citations omitted).  The Court has found that Congress expressly prescribed the reach of the phthalate prohibitions, and that Congress unequivocally and unambiguously chose to extend the reach of the prohibitions to all

covered products, regardless of their date of manufacture, as of February 10, 2009. (<u>See</u> <u>supra</u> Section III)

Assuming that the phthalate prohibitions could be considered ambiguous as to inventory, however, the Commission's retroactivity arguments are still unpersuasive. On their face, the phthalate prohibitions are not retroactive. The CPSIA was enacted on August 14, 2008. (Pub. L. No. 110-314) Section 239(a) of the CPSIA, entitled "Effective dates," states that "[e]xcept as otherwise specifically provided in this Act, this Act and the amendments made by this Act shall take effect on the date of enactment of this Act," <u>i.e.</u>, on August 14, 2008. 15 U.S.C. § 2051 note. Section 239(b) provides that certain sections of the CPSIA – but not Section 108 – will become effective some time after the date of enactment. <u>Id.</u> Therefore, the statutory "effective date" of the phthalate prohibitions is August 14, 2008. Those prohibitions make new conduct unlawful beginning 180 days later, on February 10, 2009. They do not change the legality of prior committed acts.

The Commission cites no cases that support its contention that a statute that makes future conduct unlawful has a retroactive effect. Instead, it relies entirely on <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994). However, <u>Landgraf</u> deals not with future conduct, but instead considers whether new statutory remedies should be available in cases concerning conduct that occurred <u>before</u> the statute's enactment. <u>Id.</u> at 283-84. This case presents no such issue, because the phthalate prohibitions do not attach new legal consequences to conduct that has already occurred. Instead, the new legal consequences flowing from the phthalate prohibitions unequivocally apply only to conduct that occurs 180 days or more after the prohibitions were enacted.

In the opinion letter, the Commission argues that its interpretation is necessary to avoid giving retroactive effect to the phthalate prohibitions because "the property at issue, products in inventory in the distribution chain [as of February 10, 2009], was manufactured prior to any indication from Congress or the Commission that the level of phthalates in those products would be restricted." (Bernard Decl. Ex. B) [14] However, this reasoning is not supported by the facts or by Landgraf.

As to the facts, a phthalate prohibition was proposed in the Senate as early as March 4, 2008, see 154 Cong. Rec. S1531-02, 2008 WL 582292, at *S1544, and the final phthalate prohibitions became law on August 14, 2008, at which point parties had clear notice that the level of phthalates in covered products would be restricted. Thus, even under the Commission's logic, the phthalate prohibitions would be retroactive at most with respect to products manufactured prior to August 14, 2008.

Landgraf, however, does not support the assertion that the phthalate prohibitions are retroactive because they change parties' expectations with respect to products that have already been manufactured. As the Landgraf court explained, "[e]ven uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct," but that does not mean that they are retroactive as a matter of law. Id., 511 U.S. at 270 n.24. For example, "a new property tax or zoning regulation may upset the

_____

[14] In its brief, the Commission suggests that its interpretation is consistent with its own past practice, based on legislative history concerning its powers. A 1972 House report discussing Section 2058(g)(1) states: "Thus the Commission could not establish a retroactive date for any consumer product safety rule which embodies a product safety standard." (H. Rep. No. 92-1153 at 37) This excerpt suggests that in 1972, the author of the House report believed that applying new safety standards to existing inventory would give such standards "retroactive" effect. However, this legislative history is not informative as to Congress's intent in 2008 with respect to the phthalate prohibitions, nor does it shed any light as to the phthalate prohibitions themselves, which were enacted by Congress and not promulgated by the Commission.

reasonable expectations that prompted those affected to acquire property," and "a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his life learning to count cards." Id. The potential harm that may be caused by the phthalate prohibitions is similar, and does not render the phthalate prohibitions retroactive.

Indeed, at oral argument, the Commission effectively abandoned its reliance on Landgraf (Tr. at 33:10-34:1), despite the fact that the retroactivity analysis was central to the General Counsel's opinion. This abandonment further illustrates why the opinion letter is not entitled to deference under Skidmore.

## CONCLUSION

For the reasons set forth above, the Court finds that the phthalate prohibitions unambiguously apply to existing inventory, and that the Commission's opinion to the contrary must be set aside. Therefore, it is hereby:

ORDERED that Plaintiffs' motion for summary judgment (Docket No. 13) is GRANTED;

ORDERED that Defendant's cross-motion for summary judgment (Docket No. 12) is DENIED;

DECLARED that Defendant has violated the Consumer Product Safety Improvement Act and the Administrative Procedure Act; and

ORDERED that Defendant's November 17, 2008 decision regarding the

phthalate prohibitions in Section 108 of the Consumer Product Safety Improvement Act

be set aside.

Dated: New York, New York
        February 5, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge